Christine J. AMOS, Judy Bawden, Deniece Kanon, April Joyce Riding, and Arthur Frank Mayson on behalf of themselves and others similarly situated, Plaintiffs,

v.

The CORPORATION OF the PRESIDING BISHOP OF the CHURCH OF JESUS CHRIST OF LATTER–DAY SAINTS and the Corporation of the President of the Church of Jesus Christ of Latter-Day Saints, Defendants.

Civ. No. C–83–0492W.

United States District Court, D. Utah, C.D.

Jan. 11, 1984.

---

Elizabeth T. Dunning, David B. Watkiss, Molly B. Kenny, John E. Harvey, Salt Lake City, Utah, for plaintiffs.

Dan S. Bushnell, M. Karlynn Hinman, David P. Farnsworth, Salt Lake City, Utah, for defendants.

Paul E. Reimann, Salt Lake City, Utah, amicus curiae.

## MEMORANDUM DECISION AND ORDER

WINDER, District Judge.

The defendants' motion to dismiss or, in the alternative, for summary judgment was argued orally on October 12, 1983. The plaintiffs were represented by Elizabeth T. Dunning, David B. Watkiss and Molly B. Kenny. Paul E. Reimann appeared as amicus curiae. The defendants were represented by Dan S. Bushnell and M. Karlynn Hinman. Prior to the hearing, the court had carefully read all memoranda of counsel, including the amicus curiae brief and supplemental brief filed by Mr. Reimann. After the hearing, the court took the matter under advisement and has since reviewed the memoranda and attachments thereto and has read all relevant authorities. Based on those materials and oral argument, the court renders the following decision and order.[1]

### I.

#### Background

The Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-day Saints ("the C.P.B.") and the Corporation of the President of the Church of Jesus Christ of Latter-day Saints ("the C.O.P.") are wholly owned by the Church of Jesus Christ of Latter-day Saints ("the Mormon Church"). Both the C.P.B. and the C.O.P. are corporation soles organized pursuant to the laws of Utah, Utah Code Ann. §§ 16–7–1 to –11 (1973).[2] The C.O.P. operates a clothing mill known as Beehive Clothing

---

1. On October 24, 1983, an amended complaint was filed in this matter. No new issues appear to be presented in the amended complaint, but two more individuals have been added as plaintiffs. The parties have stipulated that the court's decision on the defendants' pending motions will be binding on the two newly named plaintiffs, Ruth Arriola and Shelleen Adamson. Stipulation, C–83–0492W, at paragraph 2 (Nov. 8, 1983). Because those new plaintiffs' situation is identical in all material respects to that of the other plaintiffs and based on the stipulation, the court will only discuss the plaintiffs and counts in the original complaint.

2. A corporation sole may be formed, under Utah law, "for acquiring, holding or disposing of church or religious society property for the benefit of religion, for works of charity and for public worship, in the manner" provided under Utah law. Utah Code Ann. § 16–7–1 (1973).

Mills ("Beehive") and a gymnasium known as the Deseret Gymnasium ("Deseret"). The C.P.B. has some administrative input in Beehive and Deseret. Beehive manufactures and distributes garments and temple clothing. Deseret is a public gymnasium that contains the normal facilities found in a gymnasium.

Christine J. Amos ("Amos") was employed at Beehive from 1976 to August 25, 1982 in its personnel department. Her responsibilities included the typing and processing of insurance forms and employment applications. Affidavit of Christine Amos, Memorandum In Opposition To Defendants' Motions To Dismiss or For Summary Judgment, C–83–0492W (Aug. 24, 1983) ("Opposing Memorandum"), Attachment 1, at paragraph 4. Judy L. Bawden ("Bawden") worked as a seamstress at Beehive from 1971 to April 28, 1982. Deniece Kanon ("Kanon") was employed as a seamstress at Beehive from 1978 to May 14, 1982. April Joyce Riding ("Riding") worked as a seamstress at Beehive from 1974 to May 28, 1982. As seamstresses, all three women performed various steps in the manufacturing of garments and temple clothing before the garments were marked with certain religiously significant symbols. Affidavit of Judy Bawden, Opposing Memorandum, Attachment 2, at paragraphs 2–3; Affidavit of Deniece Kanon, Opposing Memorandum, Attachment 3, at paragraph 4; Affidavit of April Joyce Riding, Opposing Memorandum, Attachment 4, at paragraph 2. Arthur Frank Mayson ("Mayson") was employed as a building engineer at Deseret. Affidavit of Arthur Frank Mayson, Opposing Memorandum, Attachment 5, at paragraph 2. As building engineer, Mayson was responsible for maintaining the physical facility at Deseret, the equipment in the facility and the outside grounds. Id., at paragraph 3. All five individuals were fired from their jobs solely because each of them was unable or refused to satisfy the Mormon Church worthiness requirements for a temple recommend.

Amos, Bawden, Kannon, Riding and Mayson ("the plaintiffs") filed suit against the C.P.B. and the C.O.P. ("the defendants"), purporting to represent a class of employees, present and future, allegedly similarly situated. Their complaint against the defendants rests on the following grounds: (1) the defendants discriminated against the plaintiffs on religious grounds in violation of federal and state antidiscrimination laws, and the federal and state exemption from antidiscrimination laws, 42 U.S.C. § 2000e–1 and Utah Code Ann. § 34–35–2(5), respectively, as applied to employees performing non-religious jobs, violates the establishment clause of the first amendment and the due process and equal protection guarantees of the fifth amendment; (2) the plaintiffs' discharges amounted to wrongful discharges under Utah law for which they are entitled to damages and (3) the defendants wrongfully and intentionally inflicted extreme mental and emotional injury and distress on the plaintiffs by requiring them to be interviewed by clergymen concerning their eligibility for temple recommends. See Complaint, C–83–0492W, at 14 (Apr. 4, 1982) ("the Complaint"); Opposing Memorandum.

The defendants have moved to dismiss this action or, in the alternative, for summary judgment in their favor. The defendants base their motion on the following arguments: (1) the plaintiffs fail to state a claim under the exemption statutes and under the case law in this circuit; (2) this court should not rewrite the exemption statutes to meet the plaintiffs' definition of religious; (3) the exemption statutes are constitutional; (4) the wrongful discharge claim must be dismissed because there is no such claim under Utah law; and (5) the plaintiffs' claim based on the intentional infliction of emotional distress must be dismissed because the allegations do not set forth a cause of action for such a tort. See Memorandum In Support of Defendants' Motion To Dismiss This Action or, in the Alternative, for Summary Judgment, C–83–0492W (June 15, 1983) ("Supporting Memorandum"); Defendants' Reply Brief In Support of Their Motion To Dismiss or For

Summary Judgment, C–83–0492W (Sep. 29, 1983) ("Supporting Brief").

## II.

### *The Law*

In their first claim for relief, the plaintiffs assert that the defendants violated Section 703 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a) and Utah Code Ann. § 34–35–6 (Supp.1983), by requiring employees to satisfy the Mormon Church worthiness requirements for a temple recommend and that the application of the exemption for religious entities contained in section 702 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–1 ("section 702") and in Utah Code Ann. § 34–35–2(5) (Supp.1983) to the defendants to shield them from liability for discriminating against employees performing secular, non-religious jobs on the basis of religion would violate the establishment clause of the first amendment and the due process and equal protection guarantees of the fifth amendment of the United States Constitution. Complaint, at 12–13. They ask this court to permanently enjoin the defendants from applying the Mormon Church worthiness requirement to plaintiffs and other members of the same class of employees. In their second claim for relief, plaintiffs claim that the application of religious qualifications to them and other members of the same class of employees, and terminating plaintiffs' employment violate section 2000e–2(a) and Utah Code Ann. § 34–35–6 (Supp.1983). The plaintiffs seek backpay and reinstatement, pursuant to 42 U.S.C. § 2000e, for those alleged violations.

The defendants have moved to dismiss those claims on the ground that the exemptions for religious entities under federal and state law apply to them and shield them from liability for applying religious qualifications and for terminating plaintiffs for failure to meet those qualifications. The defendants further argue that those exemptions are constitutional. They do not contest that plaintiffs were fired from their employment because they failed to meet the religious test that the defendants imposed.

Section 2000e–2(a) of the United States Code makes it an unlawful employment practice for an employer:

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a). Section 34–35–6 of the Utah Code similarly prohibits an employer from engaging in a number of discriminatory employment practices. Among the various prohibitions, Utah has made it unlawful:

For an employer to refuse to hire, to discharge, to promote, demote, or to discriminate in matters of compensation against any person otherwise qualified, because of race, color, sex, age, if the individual is 40 years of age or older, religion, ancestry, national origin, or handicap.

Utah Code Ann. § 34–35–6(1)(a) (Supp. 1983). It is undisputed that the plaintiffs were fired from their employment because they failed to meet religious qualifications imposed by the defendants. Thus, under both federal and state law, the defendants engaged in unlawful discriminatory conduct unless they are exempt from those antidiscrimination provisions.

Both the state and federal antidiscrimination laws provide an exemption for religious entities. The federal exemption, section 702, provides:

This subchapter shall not apply to an employer with respect to the employment of aliens outside any state, or to a religious corporation, association, education-

al institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

42 U.S.C. § 2000e–1. Utah has exempted religious entities from the coverage of its antidiscrimination act by excluding them from the definition of employer:

"Employer" means the state or any political subdivision or board, commission, department, institution or school district thereof, and every person employing 25 or more employees within the state; but does not include religious organizations or associations, religious corporations sole, nor any corporation or association constituting a wholly owned subsidiary or agency of any religious organization or association or religious corporation sole, a bona fide private membership club (other than a labor organization).

Utah Code Ann. § 34–35–2(5) (Supp.1983). The plaintiffs do not contest that the defendants or the Mormon Church are religious entities;[3] what they contend is that application of the exemptions to employees performing secular, non-religious jobs is unconstitutional and that the plaintiffs were employees performing secular, non-religious jobs. In discussing the plaintiffs' claims of unconstitutionality, the court will only discuss section 702 because the determination regarding the federal law applies with equal force to the state exemption as it relates to the facts of this case.

A. The Question of Constitutionality

It is well established that a court may not "decide any constitutional question in advance of the necessity for its decision...." *Federation of Labor v. McAdory*, 325 U.S. 450, 461, 65 S.Ct. 1384, 1389, 89 L.Ed. 1725 (1945). *Accord Rosenberg v. Fleuti*, 374 U.S. 449, 451, 83 S.Ct. 1804, 1806, 10 L.Ed.2d 1000 (1963) (courts " 'ought not to pass on questions of constitutionality ... unless such adjudication is unavoidable....' "). Thus, if a case can be decided on a nonconstitutional issue, the court should not reach the constitutional issues. *Peters v. Hobby*, 349 U.S. 331, 338, 75 S.Ct. 790, 793, 99 L.Ed. 1129 (1955). In keeping with those principles, this court must address two threshold issues which may obviate the need to decide whether section 702 is constitutional as applied to employees performing secular, non-religious jobs. First, it must determine whether this case involves "religious" activities. Second, if the court determines that this case does not involve "religious" activities, the court must examine section 702 to determine whether it applies to non-religious activities.

The plaintiffs contend that, in analyzing whether this case involves religious activities, the court should focus on the type of jobs that plaintiffs were performing and not on the general nature of Deseret and Beehive. In support of their position, plaintiffs refer the court to Title VII cases in which courts have inquired into the particular job at issue to determine whether Title VII may be applied to a religious entity for racial and sexual discrimination and claims of retaliation.[4] After reading those cases, the court is not persuaded that a job by job analysis is the appropriate approach in all cases. Rather, the lan-

---

3. It is not clear whether the defendants are relying on themselves or the Mormon Church as the religious corporation, association or society for purposes of section 702. The plaintiffs, however, do not contest that either the defendants or the Mormon Church are religious entities under section 702.

4. In those cases, the courts were not addressing whether a court should look to the nature of the activity or the employees job in determining whether an activity is "religious"; those cases involved a determination as to whether a partic-

ular job is a position so religious in nature and purpose that the application of Title VII would offend the first amendment. *See, e.g., EEOC v. Pacific Press Publishing Ass'n*, 676 F.2d 1272 (9th Cir.1982); *EEOC v. Southwestern Baptist Theological Seminary*, 651 F.2d 277 (5th Cir.1981), *cert. denied*, 456 U.S. 905, 102 S.Ct. 1749, 72 L.Ed.2d 161 (1982); *McClure v. Salvation Army*, 460 F.2d 553 (5th Cir.), *cert. denied*, 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153, *reh'g denied*, 409 U.S. 1050, 93 S.Ct. 513, 34 L.Ed.2d 504 (1972).

guage of section 702, both in its original[5] and amended version; the definition of "religion" in Title VII;[6] the exemption for religious organizations required by the constitution,[7] and the analysis used by courts in carving out a judicial exemption from Title VII for religious organizations with regard to sexual and racial discrimination and claims of retaliation[8] convince this court that the proper analytical framework for determining whether an activity is religious in religious discrimination suits consists of a three prong test. First, the court must look at the tie between the religious organization and the activity at issue with regard to areas such as financial affairs, day-to-day operations and management. Second, whether or not there is a close and substantial tie between the two, the court next must examine the nexus between the primary function of the activity in question and the religious rituals or tenets of the religious organization or matters of church administration. If there is a substantial connection between the activity in question and the religious organization's religious tenets or matters of church administration and the tie under the first part of the test is close, the court does not need to proceed any further and may declare the activity religious. See *Feldstein v. Christian Science Monitor*, 555 F.Supp. 974 (D.Mass. 1983).[9] However, where the tie between the religious entity and activity in question

is either close or remote under the first prong of the test and the nexus between the primary function of the activity in question and the religious tenets or rituals of the religious organization or matters of church administration is tenuous or non-existent, the court must engage in a third inquiry. It must consider the relationship between the nature of the job the employee is performing and the religious rituals or tenets of the religious organization or matters of church administration. If there is a substantial relationship between the employee's job and church administration or the religious organization's rituals or tenets, the court must find that the activity in question is religious. If the relationship is not substantial, the activity is not religious.

### 1. Deseret

According to the uncontroverted Affidavit of Leon Heaps, who has been the Manager of Deseret and a member of its governing board for the past eight years, the original and present facilities of Deseret were built with funds made available by C.O.P. and were built on property owned by C.P.B. The First Presidency of the Mormon Church, which is composed of the President of the Mormon Church and two or more counselors whom he chooses to advise him, appoints the members of the

---

**5.** The relevant portion of section 702, unamended, read:

> This subchapter shall not apply ... to a religious corporation, association, or society *with respect to the employment of individuals* of a particular religion *to perform work connected with the carrying on by such corporation*, association, or society *of its religious activities....*

Pub.L. No. 88–352, 78 Stat. 255, formerly codified at 42 U.S.C. § 2000e–1 (1964) (emphasis added).

**6.** The term "religion" is defined as including "all aspects of religious observance and practice, as well as belief ...." 42 U.S.C. § 2000e(j).

**7.** The court in *King's Garden, Inc. v. F.C.C.*, 498 F.2d 51 (D.C.Cir.), *cert. denied*, 419 U.S. 996, 95 S.Ct. 309, 42 L.Ed.2d 269 (1974), explained the constitutional requirement as follows:

> The Free Exercise Clause precludes governmental interference with ecclesiastical hier-

archies, church administration, and appointment of clergy.... In addition, the guaranties of Free Exercise, Free Speech and Free Press no doubt combine to provide a religious group the right to choose on sectarian grounds those who will advocate, defend, or explain the group's beliefs or way of life, either to its own members or to the world at large....

*Id.* at 56 (citations omitted).

**8.** See *supra* note 4.

**9.** In *Feldstein*, the court reached the conclusion that the Christian Science Monitor was a religious activity after finding that there was a "close and significant relationship existing between the Christian Science Church, the Publishing Society and The Monitor" and that "the declared purpose, both at the time of its founding and until the present, of the Monitor [was] to promulgate and advance the tenets of Christian Science." *Feldstein*, 555 F.Supp. at 978.

governing board of Deseret, and those members serve at the discretion of the First Presidency. The board currently includes two general authorities of the Mormon Church,[10] one member of the Young Women's Presidency of the Mormon Church, one member of the General Board of the Relief Society of the Mormon Church, one member of the general counsel of the Church, and two members at large.[11] Deseret has no corporate or financial existence separate from C.O.P. and does not have a bank account in its own name. Deseret makes its purchases through the central purchasing division of C.O.P., and the personnel for Deseret are selected and hired through the personnel department of C.O.P. Deseret is exempt from federal and state taxes.[12] Those facts clearly establish[13] that there is an intimate connection between Deseret and the defendants and the Mormon Church.[14]

■ That does not end the inquiry, however, because, even though a religious entity may be intimately involved with the management, the day-to-day operations and the financial affairs of an activity, "not every endeavor that is affiliated, however tenuously, with a recognized religious body may qualify as a religious activity." *Feldstein*, 555 F.Supp. at 978. To qualify, there must be a clear relationship between the primary function which Deseret performs and the religious beliefs and tenets of the Mormon Church or church administration.

The Mormon Church was established in 1830. In 1911, the Mormon Church opened Deseret. Although the dedicatory prayer and the announcement of the opening of Deseret in an official publication of the Mormon Church emphasize that Deseret is to maintain an atmosphere reflecting the standards of the Mormon Church, there is nothing in the running or purpose of Deseret that suggests that it was intended to spread or teach the religious beliefs and doctrine and practices of sacred ritual of the Mormon Church or that it was intended to be an integral part of church administration.[15] Rather, its primary function is to

10. The general authorities of the Mormon Church include the President, his chosen counselors, a group of twelve men known as the twelve apostles, and members of the quorum of seventies.

11. There is no indication on the record what criteria the First Presidency of the Mormon Church uses to select members of the governing board for Deseret.

12. Those exemptions may be on the basis of Deseret's charitable activities and not because it is a religious activity. See Affidavit of Leon Heaps, Supporting Brief, Attachment, at paragraph 2; In the Matter of: Church of Jesus Christ of Latter-day Saints, Findings of Fact, Conclusions and Decision, Property I.D. No. 01 3095 (Sept. 21, 1983); Affidavit of Richard Edgley, Supporting Memorandum, Attachment, at paragraphs 2–3; Affidavit of Leon Olsen, Supporting Memorandum, Attachment, at paragraph 5.

13. There is a dispute as to whether Deseret has made or is making a profit.

14. In *Feldstein*, the court also found there was a close tie between the religious organization and activities involved. There, the court found that the Christian Science Church regularly subsidized the Monitor; that the Board of Directors for the Christian Science Church is charged with the duty to keep church periodicals edited and abreast of times, is responsible for daily reviewing material appearing in the Monitor, is responsible for its editorial content and elects the editors and manager of the Publishing Society; that the by-laws provide that no one shall be connected with the publishing efforts of the Church if he is not acceptable to the Board; that the Publishing Society appoints a Monitor Advertising Information Committee, on recommendation of local branch churches, that formulates, in part, the advertising policy of the Monitor; and that the circulation of the Monitor is developed by members of the Christian Science Church who act, without being compensated, as circulation representatives and through Christian Science Reading Rooms. *Feldstein*, 555 F.Supp. at 977.

15. The dedicatory prayer provides, in part:

Our Father in Heaven, we are assembled for the purpose of dedicating this Recreation Center, or Deseret Gymnasium, as a place where Thy sons and daughters may come to obtain training and exercise beneficial to their physical condition, that their minds may be kept alert and their bodies fitted to the many duties and responsibilities which may be required of them in their daily occupations. Provision has been made for various kinds of exercise that will be suited to the needs of one and all, that will help to fit them for the various vicissitudes of mortal life. Skilled

provide facilities for physical exercise and athletic games. Deseret is open to the public for annual membership fees or for daily or series admission fees.[16] It offers the same facilities and services that are available in other gymnasiums, and the employees perform the same jobs that are performed at any public gymnasium or athletic club. See Affidavit of Arthur Frank Mayson, Opposing Memorandum, Attachment 5. Deseret's no smoking rule is as consistent with the beliefs and practices of athletics as it is with the beliefs of the Mormon Church; furthermore, Deseret does not enforce the no smoking rule in the beauty shop and women's massage salon, which are profit-making private concessions contained within the building housing the gymnasium. Id. at paragraph 8. More importantly, there is no evidence or a contention that the religious tenets of the Mormon Church involve or require religious discrimination in employment. To the contrary, the Mormon Church, through one of its wholly owned subsidiaries, has stated that "it is 'morally evil' to deny anyone the right to employment." *In re Application of Chronicle Broadcasting Co.,* 59 F.C. C.2d 335, 377 (1976). Furthermore, the plaintiffs do not contend and there is no evidence that it is a fundamental tenet of the Mormon Church that its members must engage in physical exercise and activity and must do so in a gymnasium owned and operated by the Mormon Church and in which all employees are practicing members of the Mormon Church. In addition, defendants do not contend and there is no evidence that engaging in physical exercise is a religious ritual of the Mormon Church, or that Deseret is used as a means of teaching or spreading the Mormon Church's religious beliefs or practices. Although the Mormon Church has expressed its desire that members of the Mormon Church engage in physical exercise and have attempted to provide a facility to accommodate that desire in an atmosphere which exemplifies its beliefs, the function of Deseret is far from closely related to any religious beliefs or tenets of the Mormon Church or church administration.[17]

and faithful teachers will be provided so that all that is done by way of activity will be conducted under proper direction and in keeping with the laws of physical health. Lessons in relation to the care of the body will be provided for all.

Moreover the day will begin with humble prayer and it is the intention that whatever is done by way of exercise, training and recreation of those who patronize this gymnasium will be done in the spirit of prayer and obedience of Thy commandments.

We pray that no unclean thing may enter here but that the spirit of peace, fellowship and faithful obedience to Thy divine will and commandments may permeate this building and that all who assemble for exercise, physical development and recreation may be impressed with the fact that Thy spirit is here....

We pray our Father that ... the exercises, games and other activities will leave an impression to cause those who take part to seek for righteousness.

[M]ay all who assemble here, and who come for the benefit of their health, and for physical blessings, feel that they are in a house dedicated to the Lord. [W]e pray that ... all who come may keep the commandments of the Lord.

[M]oreover we pray that all who come may feel that the Spirit of the Lord is here, whether it be in athletic fields or in the gatherings which will come for religious purposes.

....

Now, our Father, we thank Thee for this building. May we always keep it sweet and clean morally, physically and spiritually and that the influence of Thy Holy Spirit may abide here. We ask Thee to accept our labors and Thy blessings be made manifest through all time, we humbly pray in the name of Jesus Christ Thy Beloved Son. Amen.

Supporting Memorandum, Attachment.

16. The court agrees with the statement in *Feldstein* that "a religious activity of a religious organization does not lose that special status merely because it holds some interest for persons not members of the faith, or occupies a position of respect in the secular world at large." *Feldstein,* 555 F.Supp. at 978. However, the fact that Deseret is open to the public is a factor to consider in determining the nature of the activity.

17. The court's finding does not in any way comment on the charitable nature of Deseret. Although the charitable functions that Deseret perform may be an example of the charitable services that the Mormon Church performs generally, there has been no claim or showing that the charitable services are intimately connected to religious beliefs or tenets of the Mormon Church.

In contrast, the Christian Science Monitor ("the Monitor"), the activity at issue in *Feldstein,* was closely tied to the promulgation and advancement of the tenets of the Christian Science Church. The by-laws of the Christian Science Church stated that "it is the 'privilege and duty' of every member of the Church to subscribe to periodicals published by the Church, including the Monitor." *Feldstein,* 555 F.Supp. at 977. The Monitor is published by the Christian Science Publishing Society ("The Publishing Society"), which is an organ of the Christian Science Church. The deed of trust of the Publishing Society declares that its purpose is "more effectually promoting and extending the religion of Christian Science." *Id.* The Board of Trustees of the Christian Science Church is required to "conduct the business of the Christian Science Publishing Society on a strictly Christian basis, for the promotion of the interests of Christian Science." *Id.* The by-laws require the Christian Science Church to provide a building for the Monitor's operations. *Id.* The Monitor elects, on religious grounds, not to carry advertisements for liquor, tobacco, drugs, medicines, vitamins and energy stimulants. *Id.* Both the Publishing Society and the Monitor were established by Mary Baker Eddy, who founded the Christian Science faith.

All those facts demonstrate that there is an intimate relationship between the function that the Monitor serves and the tenets of the Christian Science Church. None of those or similar facts are present in this case. Thus, although there is a close tie between the Mormon Church and Deseret with regard to management, day-to-day operations and financial affairs, the more crucial connection—the relationship between the purpose of Deseret and the religious beliefs and practices of the Mormon Church or its administration—is lacking. Those circumstances mandate that the court consider the position that plaintiff Mayson held at Deseret.

At the time plaintiff Mayson was terminated from his employment at Deseret, he held the position of building engineer, a position he had since 1972. Affidavit of Mayson, Opposing Memorandum, Attachment 5, at paragraph 1. As the building engineer, plaintiff Mayson was responsible for maintaining the physical facility at Deseret, the equipment in the facility and the grounds outside the facility. Specifically, the plaintiff's duties included the following. He had to maintain the swimming pools and chlorinating equipment, the whirlpools, exercise machines, athletic equipment, locks and lockers, electric motors, air compressors, air conditioners, furnaces, washer and dryer, showers and other plumbing and the electrical system. In addition, he was responsible for ordering the custodial and certain other supplies. Plaintiff Mayson supervised fourteen custodians and parking-lot attendants. *Id.* at paragraph 3.

None of those duties is even tangentially related to any conceivable religious belief or ritual of the Mormon Church or church administration. Furthermore, none of those duties can potentially further any alleged religious activity in which Deseret may engage. Thus, there is no basis on which the court can find that this case, as it relates to Deseret, involves religious activities.[18]

### 2. *Beehive*

The limited facts in the record indicate that Beehive and its employees create a much closer question as to whether there are sufficient relationships between the religious organizations, Beehive and the Beehive employees to find that the case, as it relates to Beehive, involves religious activity. After carefully reviewing the record, however, the court is left with the distinct impression that the present state of the

---

**18.** Plaintiffs contend that defendants are not entitled to summary judgment that Deseret and Beehive are "religious" activities, arguing that they are entitled to discovery concerning a variety of factual matters. Opposing Memorandum, at 64. In light of the defendants' position that summary judgment is proper, the state of the record and the areas into which the plaintiffs seek discovery, the court believes that any evidentiary supplement to the record would, if it had any effect, reinforce the court's finding and would not create any material issues of fact.

record is not sufficient to form the basis for a ruling on the religious nature of Beehive or the jobs of the plaintiffs who were employed there. Although there are facts indicating that Beehive may not be a religious activity and that plaintiffs' jobs are not "religious," the court believes that discovery needs to be conducted to supplement the record. Among other areas, the court thinks that plaintiffs are entitled to conduct discovery in the following areas: (1) the manufacturing of garments prior to 1960 and any subsequent changes; (2) the distribution of garments prior to 1960 and any subsequent changes; (3) the tax exempt status of Beehive; (4) the past and current employees who were or are non-members of the Mormon Church; (5) Beehive's contracts, both past and current, with private commercial enterprises for the production of garments; and (6) current hiring practices of the defendants' garment and temple clothing manufacturing plants in Mexico and England. Until those areas and others have been fully developed, the court cannot rule on whether this case, as it relates to Beehive, involves religious activities.

■ Having reached those conclusions with regard to the nature of the activities involved in this case, the court now must address whether section 702 covers secular, non-religious activities. In making that determination, the court is guided by the following general principles. A court should not construe a statute to violate the constitution "if any other possible construction remains possible." *NLRB v. Catholic Bishop of Chicago*, 440 U.S. 490, 500, 99 S.Ct. 1313, 1318, 59 L.Ed.2d 533 (1979). *See Rosenberg v. Fleuti*, 374 U.S. 449, 83 S.Ct. 1804, 10 L.Ed.2d 1000 (1963); *Communist Party v. Catherwood*, 367 U.S. 389, 81 S.Ct. 1465, 6 L.Ed.2d 919 (1961). On the other hand, "a court may not exercise legislative functions to save [a] law from conflict with constitutional limitation." *NLRB v. Catholic Bishop of Chicago*, 440 U.S. at 509, 99 S.Ct. at 1323 (Brennan, J., dissenting) (quoting *Yu Cong Eng v. Trinidad*, 271 U.S. 500, 518, 46 S.Ct. 619, 623, 70 L.Ed. 1059 (1926)). However, if the

inclusion of certain persons within the coverage of a broadly worded statute would raise serious constitutional questions, the court must find that Congress expressed an affirmative intention to include those persons within the statute's coverage. *See id.* at 501, 507, 46 S.Ct. at 619, 620.

As can be seen from the discussion below, the application of the exemption from Title VII to employees performing secular, non-religious jobs raises serious constitutional questions. Thus, the court must determine whether Congress expressed an affirmative intention to include those employees within the exemption of section 702. To make that determination, the court must look to the statutory language and the legislative history of the statute. *See id.* at 500, 504–07, 46 S.Ct. at 619, 620.

Section 702, as amended in 1972, provides clearly and unequivocally, that religious corporations, associations, educational institutions and societies are exempt from the coverage of Title VII "with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by [such an entity] *of its activities.*" 42 U.S.C. § 2000e–1 (emphasis added). Under a fair reading of that provision, designated religious entities may discriminate against employees on religious grounds with respect to *all* their activities, not just their religious activities.

The legislative history of the 1972 amendment to section 702 further substantiates that interpretation of section 702. See *infra* Section B1. For example, the joint explanatory statement of the managers at the conference on the 1972 amendments to Title VII states that "the Senate provision expanded the exemption for religious organizations from coverage under this title with respect to the employment of individuals of a particular religion in *all their activities instead of the present limitation to religious activities.*" 1972 U.S. CODE CONG. & AD.NEWS 2137, 2180 (emphasis added). In addition, when the House was discussing the conference report on the amendments to Title VII, Rep-

resentative Erlenborn made the following statement with regard to the amendment to section 702:

> Religious institutions will be covered, but with a broad exemption for anyone employed by the religious institution rather than only those people who might be utilized in religious work per se. So that I think it was clearly the thought of the conference that if a religious institution is engaged in a profit making venture they still are not covered by the provisions of this act.

118 Cong.Rec. 7567 (1972) (remarks of Rep. Erlenborn).

█ Thus, both the language of section 702 and the legislative history of the 1972 amendment to that section negate any possibility that the court could limit the application of section 702 to "religious" activities. Rather, the court is compelled to conclude that the legislative intent of that amendment is that all religious organizations, associations, educational institutions and societies may discriminate, on religious grounds, in all their activities against all their employees. The court therefore must address the plaintiffs' constitutional challenge to section 702.

## B. Establishment of Religion Clause

The first amendment to the United States Constitution prohibits Congress from making any law to inhibit or establish religion. *See NLRB v. Catholic Bishop of Chicago,* 440 U.S. 490, 499, 99 S.Ct. 1313, 1318, 59 L.Ed.2d 533 (1979). That amendment provides, in relevant part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof...." U.S. Const.

amend. I ("the religion clauses"). To the people who wrote the religion clauses, "the 'establishment' of a religion connoted sponsorship, financial support and active involvement of the sovereign in religious activity." *Walz v. Tax Commission of the City of New York,* 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970).[19] After numerous pronouncements by the Supreme Court, it is now

> firmly established that a law may be one "respecting an establishment of religion"[20] even though its consequence is not to promote a state religion ... and even though it does not aid one religion more than another but merely benefits all religions[21].... It is equally well established, however, that not every law that confers an "indirect," "remote," or "incidental" benefit upon religious institutions is, for that reason alone, constitutionally invalid.

*Committee for Public Education v. Nyquist,* 413 U.S. 756, 771, 93 S.Ct. 2955, 2965, 37 L.Ed.2d 948 (1973).

█ When a law is challenged on the ground that it violates the establishment clause because the law affords "a uniform benefit to *all* religions," the court is to be guided by the three part test that the Supreme Court set forth in *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745, *reh'g denied,* 404 U.S. 876, 92 S.Ct. 24, 30 L.Ed.2d 123 (1971); *Larson v. Valente,* 456 U.S. 228, 252, 102 S.Ct. 1673, 1687, 72 L.Ed.2d 33, *reh'g denied,* 457 U.S. 1111, 102 S.Ct. 2916, 73 L.Ed.2d 1323 (1982) (emphasis added). The *Lemon* test provides:

> First, the statute must have a secular legislative purpose; second, its principle

---

19. For a discussion of the history of the establishment clause, see *Engel v. Vitale,* 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962); *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947).

20. In discussing the establishment clause, the Supreme Court has stated that "[a] given law might not *establish* a state religion but nevertheless be one 'respecting' that end in the sense of being a step that could lead to such establishment and hence offend the First Amendment."

*Lemon v. Kurtzman,* 403 U.S. 602, 612, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745, *reh'g denied,* 404 U.S. 876, 92 S.Ct. 24, 30 L.Ed.2d 123 (1971).

21. The Supreme Court has stated that the establishment clause at least means that neither a state nor the federal government "can pass laws which aid one religion, all religions or prefer one religion over another." *Everson v. Board of Education,* 330 U.S. 1, 15, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1947).

or primary effect must be one that neither advances nor inhibits religion ...; finally, the statute must not foster "an excessive government entanglement with religion."

*Lemon,* 403 U.S. at 612–13, 91 S.Ct. at 2111. *Accord, Mueller v. Allen,* 463 U.S. 388, ——, 103 S.Ct. 3062, 3064, 3066, 77 L.Ed.2d 721 (1983).[22] If the court finds that the statute being challenged violates any of the three parts of the test, the court must find that the statute is unconstitutional under the establishment clause. *Stone v. Graham,* 449 U.S. 39, 40–42, 101 S.Ct. 192, 193–194, 66 L.Ed.2d 199 (1980) (per curiam), *reh'g denied,* 449 U.S. 1104, 101 S.Ct. 904, 66 L.Ed.2d 832 (1981).[23]

Even with the aid of that analytical framework the court faces a very difficult task. As the Supreme Court acknowledged in *Nyquist,*

it is evident from the numerous opinions of the Court, and of Justices in concurrence and dissent in the leading cases applying the Establishment Clause, that no "bright line" guidance is afforded. Instead, while there has been general agreement upon the applicable principles and upon the framework of analysis, the Court has recognized its inability to perceive with invariable clarity the "lines of demarcation in this extraordinarily sensitive area of constitutional law." ·

*Nyquist,* 413 U.S. at 761 n. 5, 93 S.Ct. at 2959 n. 5 (quoting *Lemon,* 403 U.S. at 612, 91 S.Ct. at 2111).[24]

## 1. *Secular Purpose*

When Congress passed the Civil Rights Act in 1964, it provided a narrow exemption for religious corporations, societies and associations; they were exempted only from discrimination claims with regard to reli-

**22.** In *Mueller,* the Supreme Court emphasized that the *Lemon* test provides " 'no more than [a] helpful signpost' in dealing with Establishment Clause challenges." *Mueller,* 463 U.S. at ——, 103 S.Ct. at 3066 (quoting *Hunt v. McNair,* 413 U.S. 734, 741, 93 S.Ct. 2868, 2873, 37 L.Ed.2d 923 (1973)).

**23.** The court is aware that the United States Court of Appeals for the District of Columbia Circuit, in dictum, stated that section 702 is unconstitutional as applied to discrimination against employees performing non-religious jobs. *Kings Garden, Inc. v. F.C.C.,* 498 F.2d 51 (D.C.Cir.), *cert. denied,* 419 U.S. 996, 95 S.Ct. 309, 42 L.Ed.2d 269 (1974). The district court in *Feldstein v. Christian Science Monitor,* 555 F.Supp. 974, 978–79, also expressed, in dictum, doubt as to the constitutionality of the extension of the exemption provided for religious organizations to *all* their activities. The court has not found any case since those two cases where a court has been faced with the issue raised here: the constitutionality of section 702 as applied to religious discrimination against an employee who performs a secular non-religious job.

**24.** The defendants place great reliance on *Larsen v. Kirkham,* 499 F.Supp. 960 (D.Utah 1980), *aff'd per curiam,* No. 80–2152 (10th Cir.Dec. 20, 1982) (unpublished opinion), *cert. denied,* —— U.S. ——, 104 S.Ct. 157, 78 L.Ed.2d 144 (1983). That case is inapposite. In *Larsen,* Judge Jenkins ruled only on the constitutionality of 42 U.S.C. § 2000e–2(e)(2), which applies exclusively to religious schools. He expressly confined his analysis to that section, despite the plaintiff's

attack on section 702. Judge Jenkins did note, however, that the court in *Kings Garden, Inc. v. F.C.C.,* 498 F.2d 51 (D.C.Cir.1974), had expressed the opinion that section 702 was of doubtful constitutionality. He distinguished that case from *Larsen* on the ground that "the court was concerned with the fact that § 702 would permit religious discrimination by religious organizations in even the most secular of their endeavors" and that "[i]mplicit in the opinion is the court's approval of an exception for religious schools." 499 F.Supp. at 965 n. 7.

It is clear from reading the *Larsen* opinion that the exemption at issue there, section 2000e–2(e)(2), involves different and more compelling free exercise concerns. Furthermore, the legal issue presented in *Larsen* is different from the issue presented in this case. In *Larsen,* the plaintiff conceded that it was constitutionally permissible for the college to hire only members of the Mormon Church but contended that the Constitution would not permit the college to discriminate among church members based on standards of church participation. *Id.* at 966. Judge Jenkins rejected that argument, stating that there were no "constitutional nuances which permit a religious organization to hire its own members to teach, but prohibit it from refusing to retain nominal members who are perceived as not in conformity with the currently expressed ideals of religious practice." *Id.* at 967. The only matters in *Larsen* that Judge Jenkins found to be internal church affairs exempt from government interference were "whom it will regard as members and who will best propogate its doctrine." *Id.* at 966. This case does not involve those affairs.

gious discrimination relating to their "religious" activities. Another provision exempted private and religious schools. In 1972, the Civil Rights Act was amended. In addition to other changes in the Act, section 702 was amended to eliminate the exemption of employees of educational institutions;[25] under the amended version, all private and public educational institutions were covered by the provisions of Title VII, except that religious educational institutions were included in the list of other religious entities. More significantly, the amendment broadened the exemption for religious corporations, associations, educational institutions and societies to allow these entities to engage in religious discrimination in all their activities instead of limiting the exemption to religious activities.

A review of the legislative history of the 1972 amendment reveals that there were several proposed amendments to section 702. The Labor and Public Welfare Committee ("the Committee") submitted a report and recommended bill amending the Civil Rights Act to the Senate.[26] The proposed amendment that the Committee presented to the Senate regarding section 702 read as follows:[27]

> This title shall not apply to an employer with respect to the employment of aliens outside any state, or to a religious corporation, association, *educational institution*, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, *educational institution*, or society of its religious activities [or to an educational institution with respect to the employment of individuals to perform work connected with the educational activities of such institution].

S.Rep. No. 415, 92d Cong., 1st Sess. 49 (1971).[28] The only reference in the Committee's Report to the amendment to section 702 states:

> The existing exemption for employees of educational institutions is eliminated by an amendment to section 702 (Sec. 3 of the bill).
>
> There are at present over 120,000 educational institutions, with approximately 2.8 million teachers and professional staff members and another 1.5 million nonprofessional staff members. Yet all of these employees are, in effect, without an effective Federal remedy in the area of employment discrimination.
>
> The presence of discrimination in the Nation's educational institutions is no secret. Many of the most famous and best remembered civil rights cases have involved discrimination in education. This discrimination, however, is not limited to the students alone. Discriminatory practices against faculty, staff and other employees is also common. The practices complained of parallel the same kinds of illegal actions which are encountered in other sectors of business, and include illegal hiring policies, testing provisions which tend to perpetuate racial imbalances and discriminatory promotion and certification techniques.
>
> As in other areas of employment, statistics for educational institutions indicate that minorities and women are pre-

---

**25.** The special provision relating to educational institutions in Section 703(e)(2), 42 U.S.C. § 2000e–2(e), was not disturbed.

**26.** The reason that the court is focusing on the Senate's version of the amendment is because the House did not propose a change to section 702 that would have affected religious organizations, members of the Senate attempted to amend section 702 in several respects, the Senate amended section 702 to read as it currently reads, the House receded and the Senate's amendment to section 702 was passed.

**27.** The underlined words are additions to section 702 as it read in 1972 before being amended, and the bracketed section indicates that portion of the unamended section 702 that the proposed amendment would delete.

**28.** The proposed House bill that came out of the Committee on Education and Labor would have amended section 702 by only deleting the exemption for educational institutions; it would not have added educational institutions to the list of religious entities contained in section 702. See H.R.Rep. No. 238, 92d Cong., 1st Sess. 35 (1971).

cluded from the more prestigious and higher-paying positions, and are relegated to the more menial and lower-paying jobs....

The Committee believes that it is essential that these employees be given the same opportunity to redress their grievances as are available to other employees in the other sectors of business. Accordingly, the Committee has concluded that educational institutions, like other employers in the nation, should report their activities to the Commission and should be subject to the Act. There is nothing in the legislative background of Title VII, nor does any national policy suggest itself, to support the present exemption. In fact, the Committee believes that the existence of discrimination in educational institutions, is particularly critical. It is difficult to imagine a more sensitive area than educational institutions, where the youth of the nation are exposed to a multitude of ideas and impressions that will strongly influence their future development. To permit discrimination here would, more than in any other area, tend to promote existing misconceptions and stereotypical categorizations which in turn would lead to future patterns of discrimination.

*Id.* at 11–12. *Accord,* H.R.Rep. No. 238, 92d Cong., 1st Sess. 19–20 (1971), *reprinted in,* 1972 U.S.CODE CONG. & AD. NEWS 2137, 2154–55. Thus, it is apparent that the proposed change in section 702 that the Committee sent to the Senate had nothing to do with the exemption for religious organizations; it focused entirely on narrowing the exemption for educational institutions.

When the proposed Senate Bill reached the Senate, there were a succession of attempts to further amend section 702. On January 24, 1972, Senator Allen brought up for discussion his and Senator Ervin's Amendment No. 809, which would strike out the word "religious" where it appears before the word "activities". Excerpts from the Congressional Record demonstrate that the proposed amendment was directed at religious educational institutions and not at religious organizations per se.[29]

Mr. ALLEN ...

....

One of the most horrendous provisions of S. 2515 is section 3, which removes the existing exemption for employees of educational institutions as presently contained in section 702 of the Civil Rights Act of 1964. This over-zealous proposal attempts, first, to subvert academic freedom and, second, violates the prohibition contained in the first amendment which guarantees the free exercise of religion.

Mr. President, under the present law, is exempted from the provisions of the EEOC Act not only educational institutions of all kinds but also religious corporations, associations, or societies with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, or society of its religious activities. Then it goes on in the section which is deleted from the law by the present bill, this clause, and it removes this exemption: "or to an educational institution with respect to the employment of individuals to perform work connected with the educational activities of such institution."

So it removes from the exemption, from the operation of the EEOC Act, all educational institutions of any sort with respect to their educational activities; then as to societies or corporations or associations with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, or society of its religious activities.

So that the only exemption that is given to religious societies or associations or corporations is with respect to the em-

---

**29.** Several comments by Senator Ervin during the debate refer to religious organizations generally. 118 Cong.Rec. 948 (1972).

ployment of individuals to perform work connected with their religious activities.

In other words, Mr. President, in the case of an educational institution sponsored by a church group, the provisions of the bill now before the Senate would protect that religious association or college or school or society in the employment of people of its own religion in carrying on the religious activities of that association or corporation or school. If it were a college supported by the Catholic Church or the Baptist Church or the Episcopal Church, the bill as submitted would protect it only as to the employment of someone for enabling it to carry on its religious activity. So that in a church supported school, if the Baptist supported school wanted to employ a Baptist to teach theology or if a Catholic supported school wanted to employ a Catholic to teach theology, it would be protected.

But as to all its other activities, there would be no protection. Under the provisions of the bill, there would be nothing to prevent an atheist being forced upon a religious school to teach some subject other than theology. A religious school would not like to have an atheist or people of a different faith teaching other subjects and confining its right to be selective in the choice of its faculty only to those phases of the work carrying out its religious activities.

The present law goes on from that, though, and says that every educational institution shall be exempt from EEOC in the carrying on of its educational work, but the present bill removes that exemption. Religious schools are protected under the present law as educational institutions, so that they are exempt. But if the bill as submitted is passed and becomes law, religious schools would be exempt from the provisions of the EEOC Act only insofar as the work pertains to the carrying on of religious activities. The educational activity would not be exempt.

All this amendment would do would be to knock out the word "religious" where it appears in the bill before "activities."

The bill reads as follows:

This title shall not apply to any employer with respect to the employment of aliens outside any State—

This is in the present law and in the bill itself.

Or to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its religious activities.

The amendment would knock out the word "religious," leaving in the exemption in the carrying out of its activities. Exemption from the act would be provided by the amendment as to religious schools, as to religious societies, as to religious corporations or associations, and as to all educational institutions.
. . . .

When the bill seeks out and draws under its so-called protection, active control, and domination, every school in the country, every college in the country, every church-supported school in the country, that is going a little bit too far.

The amendment by the distinguished senior Senator from North Carolina (Mr. Ervin) and myself would preserve this exemption and would leave the present law exactly as it is. It would say to the people who want so greatly to expand the field of operations of the EEOC, "Do not touch the colleges. Do not try to take over the method by which the colleges and schools throughout the country are educating the young people of the country."

118 Cong.Rec. 946–49 (1972) (remarks of Sen. Allen). Senator Allen withdrew the proposed amendment because there was another matter that needed to come before the Senate but stated that he would reoffer the amendment at a later time. *Id.* at 949.

On February 17, 1972, Senator Ervin called up amendment 809. *Id.* at 4503. Although the Senate agreed not to debate the proposed amendment at that time, Senator Ervin made the following statement about that amendment after reading it into the record:

> In other words, the amendment would exempt religious corporations, associations, and societies from the application of this act insofar as the right to employ people of any religion they see fit is concerned. That is the only effect of this amendment.
>
> In other words, this amendment is to take the political hands of Caesar off of the institutions of God, where they have no place to be.

*Id.* That statement demonstrates that the Senator's concerns were not limited to religious educational institutions but extended to all religious institutions, a concern which he had briefly mentioned during the discussions of the amendment on January 24, 1972. *Id.* at 948.

Amendment No. 809 was not called up again until February 21, 1972. At that time neither Senator Ervin nor Senator Allen discussed the matter; Senator Ervin merely indicated that they were ready to vote. *Id.* at 4813.[30] That amendment was adopted by a voice vote, *id.* at 4813, and incorporated in the final bill passed by the Senate. See *id.* at 4940–4941, 4944, 4948.[31] The Senate's amendment to section 702 was included in the bill that came out of the conference committee and was approved by both the House and the Senate. See *id.* at 7166–7170, 7563–7567; 1972 U.S. CODE CONG. & AD.NEWS, 2137, 2180.

Prior to the 1972 amendment, the Senate considered and passed an amendment to section 702 that similarly broadened the exemption provided to religious organizations.[32] 116 Cong.Rec. 34,566. Although that proposed amendment never became law, the court believes that the legislative debates on that bill also are relevant, especially in light of Senator Williams' citation to that amendment when the current version of section 702 was being considered by

---

**30.** Certain members of the Senate were not convinced that the amendment should be adopted.

> Mr. Williams: Mr. President, the amendment proposed by the Senator from Alabama broadens the present exemption found in title VII and retained in the committee bill, for a religious corporation, association, educational institution or society with respect to employment of individuals of a particular religion to perform work connected with the religious activities of such institution.
>
> This amendment would have the effect of exempting these institutions from the operation of title VII insofar as religion is concerned whether or not their activities are religious or secular.
>
> I do not believe that the religious integrity of these institutions would be compromised by providing equal job opportunities for employees in positions unrelated to the religious activities of such institutions.
>
> Mr. President, this is the second attempt to provide such an exemption. Several weeks ago, an amendment was offered that would provide a complete exemption from title VII to employees of educational and religious institutions. That amendment, No. 815 was soundly defeated on a vote of 55 to 25 on February 1.
>
> Now, we are faced with another such amendment. Admittedly, it is a much nar-

> rower exemption that is offered since it only applies to religion. Nonetheless, I believe it should not be adopted.
>
> Many of these religious corporations and associations often provide purely secular services to the general public without regard to religious affiliation, and most of the many thousands of persons employed by these institutions perform totally secular functions. In this regard, employees in these "religious" institutions perform jobs that are identical to jobs in comparable secular institutions. It is appropriate, therefore, that these persons employed by religious corporations and associations should be given the same equal employment opportunities as those persons employed in comparable positions by secular employers.

118 Cong.Rec. 4813 (1972).

**31.** It appears that there is a typographical error in section 702 of the amended Senate bill that was read in the record after it was passed. *See id.* at 4944.

**32.** The amendment passed by the Senate in 1970 but never enacted provided, in pertinent part, that Title VII "shall not apply ... to a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion." 116 Cong. Rec. 34,573 (1970).

the Senate in 1972. See 118 Cong.Rec. 4813 (1972) (remarks of Sen. Williams).

Mr. Ervin. Mr. President, under this bill, if a religious educational institution wanted to employ a professor of mathematics it could be compelled by the Commission to employ an infidel as professor of mathematics. In other words, the only exemptions are extended to those actually participating in the religious activities of the religious institution.

Justice Douglas has said in connection with a school prayer case, that you could not separate secular and nonsecular activities of a religious institution. If that is true, this bill trespasses on the first amendment right to religious freedom.

Apart from that, as a matter of policy, I think people who establish a religious institution and people who establish a church should be allowed to select a janitor or a secretary who is a member of the church in preference to some infidel or nonmember. However, they could not do that under this bill. My amendment would exempt religious organizations from the control of the State. If that is not in line with the letter of the law, it certainly is in line with the spirit of the law.

I hope all those who believe in religious freedom will support the amendment. We ought not to let Caesar undertake to control what belongs to God. 116 Cong.Rec. 34,565 (1970) (remarks of Sen. Ervin).

There is an additional matter in the congressional record that helps shed some light on the amendment to section 702. On February 1, 1972, Senator Ervin offered an amendment, Amendment No. 815, which would have excluded educational and religious institutions completely from the coverage of Title VII; that amendment was defeated by a vote of 25 to 55. See 118 Cong.Rec. at 1995. Although that proposed amendment is much broader than the amendment which actually became law, the court believes that the comments made by Senator Ervin during the debate on the proposed amendment further illuminate the legislative purpose behind broadening the religious exemption contained in section 702.[33]

This section would split the activities of a religious organization into two segments, although they are irretrievably held mainly by the organization itself. It would be so generous to the good Lord as to permit the good Lord to retain jurisdiction over those employees of the religious organizations who did work strictly in the religious field, but it would arrogate to the Commission jurisdiction of those employees of the religious organizations whose work was more of a mundane nature.

For example, under the bill in its present form, the EEOC would have the power to compel a Christian church to employ a Mohammedan or an atheist or an agnostic as secretary. When the Federal Government begins to grasp the power of things of the Lord, it is reaching a state of governmental intemperance which is alien to the first amendment. The first amendment was designed to build a wall of separation between church and state; the bill proposes

---

**33.** During the debate and consideration of that proposed amendment, Senator Ervin also made the following comments after quoting section 702 of the bill before the Senate:

Mr. President, as I construe those words, they attempt to do an impossible thing, that is, to separate the religious activities of a religious corporation, association, educational institution, or society, from those of its activities which can be said to be not religious, nonreligious, or unreligious.

As Supreme Court Justice Douglas so well declared in one of the school prayer cases, it is impossible to separate the religious and nonreligious activities of a religious corporation or religious educational institution or religious society from its other activities. This is so because the whole religious organization is one body, and yet the bill would attempt to divorce the two kinds of activities each from the other and give a Federal agency the power to dictate, or at least ultimately to control, the employment practices of religious corporations, religious associations, religious educational institutions and religious societies from each other.

*Id.* at 1973 (remarks of Sen. Ervin). See *id.* at 1977–1995.

to tear down, in part, that wall of separation and to give to Caesar some of the jurisdiction over the affairs of the Lord. The first amendment reads:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.

In order that the Senate might understand what that provision means, and why it was designed to build an impregnable wall of separation between church and state, I invite the attention of the Senate to the case of Everson against Board of Education of the township of Ewing, which is reported in 30 [sic] U.S. Reports at page 1....

....

I do not read this case for the purpose of judging the soundness of applying the first amendment to the facts in the case, but for the purpose of disclosing to the Senate how the first amendment was attempted to build an impregnable wall of separation between the State—that term being applied here to the Federal Government—and religion....

....

[I]n the words of Jefferson, the clause against the establishment of religion by law was intended to erect a wall of separation between church and state. I respectfully submit that we do not erect a wall of separation between church and state when we permit the agents of the state to tell a religious corporation, a religious association, a religious educational institution, or a religious society, whom it is to employ for any purpose, whom it is to promote for any purpose, or whom it may discharge for any reason.

So this bill is an assault on the wall of separation which the first amendment was intended to build between civil government and religion.

....

I digress from reading further opinions in this case to emphasize these words:

The first amendment has erected a wall between church and state. That wall must be kept high and impregnable.

I respectfully submit that this bill would destroy in part the wall between church and state. I submit that it would not keep that wall high and impregnable.

I cannot understand why the EEOC or those who support it are so anxious to extend its powers so that it will have jurisdiction over who is employed by a church to be a janitor, or who is employed to be a secretary for a church, or who is employed—as is done in many instances where religious organizations have fundraising drives—to raise money for them. Yet, this bill would extend the power of the EEOC over these employees of churches; and, as I have said, it would lay the political hands of Caesar upon the things of God.

[T]he first amendment was a design to raise a wall of separation between church and state and was designed to keep the state's hands off the church and the church's hands off the state. Certainly, a bill which is designed to lay the hands of the state on the employment practices of religious denominations is not keeping the hands of the state off the church.

....

Mr. President, I would like to emphasize what Justice Jackson said in his opinion in these words, speaking of the first amendment:

It was intended not only to keep the states' hands out of religion, but to keep religion's hands off the state.

Congress does not keep the state's—that is, the Government's—hands out of religion by enacting a bill which says that the Government can regulate and control the employment practices of all of the religious groups in this country and all of the religious schools in this country; that is, all of the religious institutions in this country, in respect to all of their employees who are not strictly engaged in carrying out the religious affairs of those institutions.

I submit, without fear of successful contradiction, that if Congress were to enact the bill and thereby say that the Commission can control the employment practices of all religious groups in the United States in respect to what persons may be employed by them, other than those who are engaged strictly in preaching and activities of that kind, that is not keeping the hands of the state off religion. For the life of me, I cannot comprehend why the EEOC and why those who are championing this cause are so greedy for power that they want to lay the political hands of Caesar on the employment practices of churches of God.

*Id.* at 1977–81 (remarks of Sen. Ervin).[34]

 A review of that legislative history clearly demonstrates to this court that there was a valid legislative purpose behind broadening the amendment to section 702. The legislative goal of assuring that the government remains neutral and does not meddle in religious affairs by interfering with the decision-making process in religions is a valid secular purpose.[35] Furthermore, there is no indication that Congress amended section 702 for a religious purpose or to promote religion or religious beliefs. Thus, section 702 passes the first part of the test in *Lemon.*[36] *Compare Stone v. Graham,* 449 U.S. 39, 101 S.Ct. 192, 66 L.Ed.2d 199 (1980), *reh'g denied,* 449 U.S. 1104, 101 S.Ct. 904, 66 L.Ed.2d 832 (1981) *with Committee for Public Education v. Nyquist,* 413 U.S. 756, 773, 93 S.Ct. 2955, 2965, 37 L.Ed.2d 948 (1973); *and Lemon v. Kurtzman,* 403 U.S. 602, 613, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745, *reh'g denied,* 404 U.S. 876, 92 S.Ct. 24, 30 L.Ed.2d 123 (1971). That does not end the inquiry, however, because "the propriety of a legislature's purposes may not immunize from further scrutiny a law which either has a primary effect that advances religion, or which fosters excessive entanglements between church and state." *Nyquist,* 413 U.S. at 774, 93 S.Ct. at 2966.

## 2. *Primary Effect*

The defendants contend that the exemption for religious organizations contained in section 702 is neutral and that it is merely an accommodation to first amendment

---

**34.** On February 22, 1972, Senator Ervin offered Amendment No. 860, which would have exempted teachers and other faculty members of the public schools from the coverage of Title VII. *Id.* at 4917. That amendment was defeated by a voice vote. *Id.* On that same day, Senators Ervin and Allen offered Amendment No. 844, which would have removed from the coverage of Title VII all employment practices of all educational institutions. *Id.* at 4919. That amendment also was defeated; this time by a vote of 15 to 70. *Id.*

**35.** In evaluating the legislative purpose, the court is not expressing an opinion as to whether Congress was correct in its evaluation. The court merely is examining the legislative history to determine whether the legislative purpose was secular. The court notes, however, that, in cases involving claims of sexual and racial discrimination and claims of retaliation, federal courts have held that Title VII can and must be applied to the employment practices of religious employers with regard to job positions not involving "minister-like" functions and that no excessive entanglement or. impermissible abridgment of free exercise results. In those cases, the courts found, *inter alia,* that the free exercise rights were outweighed by the compelling governmental interest in eliminating discrimination and providing equal employment opportunities.

**36.** The court in *Kings Garden, Inc. v. F.C.C.,* 498 F.2d 51 (D.C.Cir.1974) did not discuss secular purpose but merely concluded that it could not "see what secular purpose is served by the unbounded exemption enacted in 1972." *Id.* at 55. The court in *Feldstein v. Christian Science Monitor,* 555 F.Supp. 974 (D.Mass.1983), did not make any statements regarding secular purpose; rather, it confined its comments to the following statement:

> It is not mandated under the Constitution that Congress prohibit discrimination on grounds of religion in private sector employment. However, having elected to do so in the Civil Rights Act of 1964, the Congress *is* under a constitutional obligation to do so in a way that neither favors nor disfavors secular, private sector enterprises that may be conducted by religious organizations.... It is well established the expression of a preference for all religions is as constitutionally infirm as a preference for, or a discrimination against, a particular religion.... Either would fly in the face of the terms and requirements of the First Amendment.

*Id.* at 978–79 (emphasis in original) (citations omitted).

rights. They assert that, if Title VII did not provide such an exemption, it would: (1) interfere with the free exercise of religion and (2) create and establish limitations on religious belief, establishing the limits of belief and conscience by state and federal decision, constituting a true establishment. Supporting Memorandum, at 45–53.

It is inevitable that there will be tension between the first amendment's protection of the free exercise of religion and its prohibition against congressional laws respecting an establishment of religion. That tension often makes it impossible "to promote the former without offending the latter." *Nyquist*, 413 U.S. at 788, 93 S.Ct. at 2973. Consequently, Congress must exercise "some measure of accommodation to avoid the constitutionally impermissible result of totally subordinating either religion clause to the other." *Lanner v. Wimmer*, 662 F.2d 1349, 1352 (10th Cir.1981).

To accommodate the two religion clauses, the court has adhered to a policy of neutrality, neither advancing nor inhibiting religion.[37] The course of constitutional neutrality is not absolutely straight, however.

> [R]igidity could well defeat the basic purpose of [the religion clauses], which is to ensure that no religion be sponsored or favored, none commanded, and none inhibited. The general principle deducible from the First Amendment and all that has been said by the Court is this: that we will not tolerate either governmentally established religion or governmental interference with religion. Short of those expressly proscribed governmental acts there is room for play in the joints productive of a benevolent neutrality which will permit religious exercise to

exist without sponsorship and without interference.

Each value judgment under the Religion Clauses must therefore turn on whether particular acts in question are intended to establish or interfere with religious beliefs and practices or have the effect of doing so.

*Walz*, 397 U.S. at 669, 90 S.Ct. at 1411–1412.

It is apparent that "the limits of permissible state accommodation of religion are by no means co-extensive with the noninterference mandate of the free exercise clause," *Walz*, 397 U.S. at 673, 90 S.Ct. at 1413–1414. However, if a statute goes beyond what is mandated by the free exercise clause in accommodating religion, the statute may no longer maintain the requisite course of constitutional neutrality. If in the process of accommodating the free exercise clause the statute subordinates the establishment clause by sponsoring religion, the statute must be declared unconstitutional. *See Nyquist*, 413 U.S. at 788, 93 S.Ct. at 2973. *Cf. Wisconsin v. Yoder*, 406 U.S. 205, 221, 92 S.Ct. 1526, 1536, 32 L.Ed.2d 15 (1972); *Sherbert v. Verner*, 374 U.S. 398, 409–10, 83 S.Ct. 1790, 1796–1797, 10 L.Ed.2d 965 (1963). Thus, in areas where the religion clauses may conflict with one another, Congress must exercise a great deal of caution in drawing the boundaries of accommodation.[38]

In determining whether Congress has maintained a neutral approach to religion in section 702 or whether Congress has promoted free exercise values at the expense of the establishment clause, something Congress is not constitutionally permitted to do,[39] the court first will address

---

**37.** "The court has struggled to find a neutral course between the two Religion Clauses, both of which are cast in absolute terms, and either of which, if expanded to a logical extreme, would tend to clash with the other...." *Walz*, 397 U.S. at 668–69, 90 S.Ct. at 1411.

**38.** "[T]he Supreme Court has repeatedly recognized that exempting religious organizations is a risky business that requires sensitivity to both free-exercise and establishment clause values. In effect, legislatures, agencies, or courts must

balance the two values." Bagni, Discrimination in the Name of the Lord: A Critical Evaluation of Discrimination by Religious Organizations, 79 Colum.L.Rev. 1514, 1537 (1979).

**39.** "The Supreme Court has held that the Free Exercise Clause itself compels government to make some accommodation to religious realities and needs. So long as government aid goes no further than arguably required by this principle, there is no violation of the separation required by the Establishment Clause. *O'Hair v. Andrus*,

the entanglement issue raised by defendants and then will address the free exercise issue. Finally, the court will discuss whether the direct and immediate effect of section 702 is to advance religion.

■ The defendants assert that if courts had to determine whether religious organizations were engaging in religious activities with regard to particular employees and, if not, to apply Title VII to them, excessive government entanglement would result.[40] The court does not agree.

In interpreting the Constitution, courts must continually draw fine distinctions. *See Walz*, 397 U.S. at 679, 90 S.Ct. at 1416. The drawing of those fine distinctions in this area does not result in excessive entanglement. *See Wisconsin v. Yoder*, 406 U.S. 205, 215–16, 92 S.Ct. 1526, 1533–1534, 32 L.Ed.2d 15 (1972); *id.* at 237, 240–41, 92 S.Ct. at 1544, 1545–1546 (White, J., concurring).[41] A determination of what is religious activity and what is not does not affect "the decisions of the highest judicatories of a religious organization of hierarchical polity on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law." *Serbian Eastern Orthodox Diocese for the United States of America and Canada v. Milivojevich*, 426

U.S. 696, 713, 96 S.Ct. 2372, 2382, 49 L.Ed.2d 151, *reh'g denied*, 429 U.S. 873, 97 S.Ct. 191, 50 L.Ed.2d 155 (1976). Moreover, it does not involve the court in a continuing comprehensive surveillance of religious organizations. See, *Lemon*, 403 U.S. at 619–20, 91 S.Ct. at 2114–2115.

■ It is well established that Congress intended Title VII to apply to religiously owned employers, such as the defendants. Under Title VII, religious employers may not discriminate against employees who are not in "minister-like" positions on the basis of race, sex, national origin or in retaliation for the employee's participation in EEOC proceedings. *See, e.g., EEOC v. Pacific Press Publishing Association*, 676 F.2d 1272 (9th Cir.1982); *EEOC v. Southwestern Baptist Theological Seminary*, 651 F.2d 277 (5th Cir.1981), *cert. denied*, 456 U.S. 905, 102 S.Ct. 1749, 72 L.Ed.2d 161 (1982). Subjecting religious employers to the administrative requirements and judicial proceedings in those situations does not result in impermissible government entanglement with religion. *See, e.g., Pacific Press*, 676 F.2d at 1278–82; *Southwestern Baptist*, 651 F.2d at 285–86; *EEOC v. Mississippi College*, 626 F.2d 477, 486–89 (5th Cir.1980), *cert. denied*, 453 U.S. 912, 101

613 F.2d 931, 935 (D.C.Cir.1979) (citations omitted).

40. The defendants also contend that by subjecting religious organizations to Title VII for religious discrimination in non-religious jobs, the government has favored those who deviate from the Mormon Church rules and established and favored the plaintiffs. Supporting Memorandum, at 48. The Supreme Court rejected a similar argument in *Bob Jones University v. United States*, 461 U.S. 574, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983).

> Bob Jones University also contends that denial of tax exemption violates the Establishment Clause by preferring religions whose tenets do not require racial discrimination over those which believe racial intermixing is forbidden. It is well settled that neither a State nor the Federal Government may pass laws which "prefer one religion over another," ... but "[i]t is equally true" that a regulation does not violate the Establishment Clause merely because it "happens to coincide or harmonize with the tenets of some or all religions." ... The IRS policy at issue here is founded on a

> "neutral, secular basis," ... and does not violate the Establishment Clause....

*Id.* at —— n. 30, 103 S.Ct. at 2035 n. 30. Although the Court went on to note that "the uniform application of the rule to all religiously operated schools *avoids* the necessity for a potentially entangling inquiry into whether a racially restrictive practice is the result of sincere religious belief," there is no indication that the absence of that factor would have changed the Court's decision. *Id.* (citation omitted) (emphasis in original). In this case, although the inquiry is potentially entangling, the entanglement is not excessive.

41. *But cf. Gillette v. United States*, 401 U.S. 437, 457, 91 S.Ct. 828, 840, 28 L.Ed.2d 168 (1971) ("At any rate, it is true that 'the more discriminating and complicated the basis of classification for an exemption—even a neutral one—the greater the potential for state involvement' in determining the character of persons' beliefs and affiliations, thus entangling government in difficult classifications of what is or is not religious, or what is or is not conscientious.") (citation omitted).

S.Ct. 3143, 69 L.Ed.2d 994 (1981). As the Ninth Circuit stated in·*Pacific Press:* [42]

The present case is distinguishable from *NLRB v. Catholic Bishop* because neither the judgment in this suit nor Title VII's enforcement mechanisms result in any ongoing scrutiny of Press' operations. The potential for ongoing entanglement or continuous supervision of church affairs by the government's regulations is the critical entanglement issue which deserves the most emphasis. In *Catholic Bishop,* 440 U.S. at 502–03 [99 S.Ct. at 1319–1320], ... the court found a serious risk of excessive entanglement because the enforcement of the National Labor Relations Act's mandatory collective bargaining provisions at a sectarian school would have empowered the NLRB to judge the good faith beliefs of clergy-administrators, to assess the validity of positions central to the school's religious mission and to issue cease and desist orders. EEOC cannot issue coercive orders and lacks independent authority to initiate actions to enforce Title VII. As discussed earlier, EEOC actions must be initiated by an employee filing charges with the Commission. Although the district court's award of monetary damages to [the complaining employee] may inhibit Press from discharging employees who participate in Title VII proceedings, this remedy does not amount to continuous supervision of the kind the Supreme Court sought to avoid in *Catholic Bishop.*

Although Press insists that *NLRB v. Catholic Bishop, supra,* signals a major change in the Supreme Court's attitude toward regulation of religious institutions, *Catholic Bishop* does not support Press's sweeping position that all employees at a sectarian publishing house are immune from EEOC scrutiny. In a case decided after *Catholic Bishop,* the Fifth Circuit considered the nature of EEOC's intrusion into a sectarian school's operations and found the relationship created between the government and the college was acceptably limited both in scope and effect. *EEOC v. Mississippi College,* 626 F.2d at 487–88. Furthermore, EEOC's relationship to religious employers threatens no more entanglement than other statutes which regulate employee compensation at religious institutions. *See generally Marshall v. Pacific Union Conference of Seventh-Day Adventists,* [1977] Emp. Prac.Dec. (CCH) 7806 (C.D.Cal.1977) (Equal Pay Act); *Mitchell v. Pilgrim Holiness Church Corp.,* 210 F.2d 879 (7th Cir.), *cert. denied,* 347 U.S. [1013], 1103, 74 S.Ct. 867, 98 L.Ed. 1136 (1954) (minimum wage law).

676 F.2d at 1282. *Accord, Southwestern Baptist,* 651 F.2d at 285–86; *Mississippi College,*[43] 626 F.2d at 488. Moreover, ascertaining whether an activity is religious or non-religious will require no more government involvement in religion than the concededly non-excessive entanglement that occurs when a state must determine whether a purported church qualifies for a property tax exemption. *See Walz,* 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697.

Furthermore, federal courts already analyze questions regarding whether or not to impose liability on religious employers for sex or racial discrimination or retaliation under Title VII by undertaking an analysis of the duties and functions of particular jobs. For courts to apply a similar but more limited analysis, such as the court

---

**42.** In that case, a female employee charged the defendant, a nonprofit corporation which was affiliated with the Seventh-Day Adventist Church, with sex discrimination and retaliatory discharge. The court held that the defendant had violated the employee's rights under Title VII.

**43.** Language used in the court's analysis in that case raises the question whether the court would have found no excessive entanglement if there would not have been an exemption for all religious discrimination. See *Mississippi College,* 625 F.2d at 487–88. This court believes, however, that an exemption limited to religious activities would not change the court's resolution of the issue because of the nature of the institution involved and the more limited analysis the court would use in the area of religious discrimination.

proposes in this case, to cases of religious discrimination would be no more entangling.

The first case to apply such an analysis was *McClure v. Salvation Army*, 460 F.2d 553 (5th Cir.), *cert. denied*, 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153, *reh'g denied*, 409 U.S. 1050, 93 S.Ct. 513, 34 L.Ed.2d 504 (1972). In *McClure*, (1972), an ordained Salvation Army minister brought suit against the Salvation Army under Title VII, alleging sex discrimination. After determining that the Salvation Army was an employer within the meaning of Title VII, the court determined that the job of minister is a position to which Title VII cannot constitutionally be applied because that position is so religious in nature.[44]

> The relationship between an organized church and its ministers is its lifeblood. The minister is the chief instrument by which the church seeks to fulfill its purpose. Matters touching this relationship must necessarily be recognized as of prime ecclesiastical concern. Just as the initial function of selecting a minister is a matter of church administration and government, so are the functions which accompany such a selection.
>
> . . . .
>
> An application of the provisions of Title VII to the employment relationship which exists between the Salvation Army and Mrs. McClure, a church and its minister, would involve an investigation and review of these practices and decisions and would, as a result, cause the State to intrude upon matters of church administration and government which have so many times before been proclaimed to be matters of a singular ecclesiastical concern. Control of strictly ecclesiastical matters could easily pass from the church to the State. The church would then be without the power to decide for itself, free from State interference, matters of church administration and government. Moreover, in addition to

injecting the State into substantive ecclesiastical matters, an investigation and review of such matters of church administration and government as a minister's salary, his place of assignment and his duty, which involve persons at the heart of any religious organization, could only produce by its coercive effect the very opposite of that separation of church and State contemplated by the First Amendment. . . .

460 F.2d 558–60.

After *McClure*, courts continued to use that analysis in applying Title VII to religious employers. For example, the Fifth Circuit, in *Mississippi College*, rejected the excessive entanglement argument and carefully analyzed the duties and functions of the faculty at an educational institution owned by the Mississippi Baptist Convention to determine whether the *McClure* exemption for church ministers should apply to such jobs.

> The college is not a church. The college's faculty and staff do not function as ministers. The faculty members are not intermediaries between a church and its congregation. They neither attend to the religious needs of the faithful nor instruct students in the whole of religious doctrine. That faculty members are expected to serve as exemplars of practicing Christians does not serve to make the terms and conditions of their employment matters of church administration and thus purely of ecclesiastical concern.

626 F.2d at 485.

In *Southwestern Baptist*, the Fifth Circuit again carefully scrutinized the duties and functions of jobs, this time at a seminary, finding that the faculty were "ministers" under the *McClure* analysis but that the seminary support staff and those administrators "whose function relates exclusively to the seminary's finance and other non-academic departments" were not and therefore were subject to Title VII. 651

---

**44.** The court stated that it was "[r]estricting [its] decision to the Church-minister relationship and expressly refraining from any decision as to

other church employees. . . ." *McClure*, 460 F.2d at 555.

F.2d at 284–85.[45] More importantly, when the court rejected the contention that all the seminary's employees served a ministerial function, it observed that the status of the employees under Title VII is "a legal conclusion subject to plenary review":

> While religious organizations may designate persons as ministers for their religious purposes free from any governmental interference, bestowal of such a designation does not control their extra-religious legal status.

651 F.2d at 283.

 As can be seen from those cases, federal courts already employ an analytical framework that distinguishes between degrees of religious responsibility in various jobs in the context of sex and race discrimination or retaliation under Title VII. The court recognizes that the application of the exact same analysis in religious discrimination suits may create the danger of excessive entanglement. The area of religious discrimination may be more sensitive than the area of sex or race discrimination because the type of discrimination involved is intimately connected with the nature and purpose of religious organizations. That does not mean, however, that the court may not inquire at all;[46] it means that the type of inquiry must be less intrusive. The three part test that the court developed and applied in its determination of whether this case, as it relates to Deseret, involves a religious activity, see *supra* pp. 799–802, is the type of test that must be applied in this area [47] to avoid excessive entanglement.[48] That test gives religious organizations a broader area in which to make religiously discriminatory employment decisions, ensuring that courts do not intrude in decisions that arguably involve matters of church government, faith or doctrine or make determinations as to whether religious beliefs are asserted in good faith or are legitimate. On the other hand, it is not so broad that it distorts the concept of "religious activity."

Hence, the application of Title VII to religious organizations engaging in religious discrimination in secular, non-religious activity does not excessively entangle the government with religious organizations.

 The court now will address the defendants' free exercise argument.[49] A

---

**45.** The court's explanation of why they were not ministers was as follows:

> When churches expand their operations beyond the traditional functions essential to the propogation of their doctrine, those employed to perform tasks which are not traditionally ecclesiastical or religious are not "ministers" of the "church" entitled to *McClure*-type protection.

651 F.2d at 285.

**46.** In *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972), the Supreme Court pointed out that "to have the protection of the Religion Clauses, the claim must be rooted in religious belief." *Id.* at 215–16, 92 S.Ct. at 1533, 1534.

**47.** Because the extent of the inquiry used in religious discrimination cases would differ from that used in other types of discrimination cases, the results in cases involving the same type of employees may differ. The court does not believe that possibility should preclude religious discrimination cases from being subject to analysis when the mode of analysis does not involve excessive entanglement.

**48.** The initial analysis set out in *Southwestern Baptist,* 651 F.2d at 283, is not unlike the first and second prong of the test used by this court. However, that court did not end its inquiry when it determined that there was a close and substantial tie between the seminary and the church (convention) with regard to financial affairs and control and that the seminary "was an integral part of a church, essential to the paramount function of training ministers who will continue the faith"; instead, it went on to determine whether particular employees were ministers. *Id.* at 283–85. Under this court's test, the inquiry in a religious discrimination case involving that set of facts probably would have ended after the first two prongs were applied.

**49.** Amicus Paul E. Reimann suggests that the court lacks "jurisdiction" over this action and in support cites *Serbian East Orthodox Diocese v. Milivojevich,* 426 U.S. 696, 96 S.Ct. 2372, 49 L.Ed.2d 151, *reh'g denied,* 429 U.S. 873, 97 S.Ct. 191, 50 L.Ed.2d 155 (1976). *Presbyterian Church v. Mary Elizabeth Blue Hull Memorial Presbyterian Church,* 393 U.S. 440, 89 S.Ct. 601, 21 L.Ed.2d 658 (1969); *Kedroff v. Saint Nicholas Cathedral,* 344 U.S. 94, 73 S.Ct. 143, 97 L.Ed. 120 (1952); and *Watson v. Jones,* 80 U.S. (13 Wall) 679, 20 L.Ed. 666 (1872). Amicus's reliance on

court cannot declare a statute unconstitutional as a violation of the free exercise clause simply because it affects the operation of a religious organization. *Pacific Press*, 676 F.2d at 1279. To determine whether a statute violates the free exercise clause, the court must consider the following factors:

(1) the magnitude of the statute's impact upon the exercise of religious belief,

(2) the existence of a compelling state interest justifying the burden imposed upon the exercise of the religious belief, and

(3) the extent to which recognition of an exemption from the statute would impede the objectives sought to be advanced by the state.

*Id.* at 1279 (quoting *Mississippi College*, 627 F.2d at 488, citing *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) and *Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963)).

■■■ There is little doubt that Congress is compelled to exempt religious organizations from Title VII with regard to religious discrimination in their religious activities to avoid clashing with the free exercise clause. That is not the issue, however. The question is whether requiring the defendants to refrain from discriminating on the basis of religion in their secular, non-religious activities infringes the free exercise of their religious beliefs. The court does not believe that it does.

Preventing religious discrimination in those instances can have no significant impact on the exercise of "any sincerely held religious belief" of the Mormon Church. *Southwestern Baptist*, 651 F.2d at 286. While the impact on the defendants of prohibiting religious discrimination in secular, non-religious activities could be profound,[50] the relevant inquiry "is not the impact of the statute upon the institution, but the impact of the statute upon the institution's exercise of its sincerely held religious beliefs." *Mississippi College*, 626 F.2d at 488. None of the affidavits that the defendants submitted even remotely suggest that the Mormon Church holds any religious tenet that requires all persons employed by its corporate entities in secular, non-religious activities to be templeworthy Mormons. Furthermore, such a suggestion would be inconsistent with the representations made by the Mormon Church to the F.C.C. that "it is 'morally evil' to deny anyone the right to employment." *In re Application of Chronicle Broadcasting Co.*, 59 F.C.C.2d 335, 337 (1976). Enforcement of Title VII here therefore does not conflict with the Mormon Church's doctrines or prohibit "an activity 'rooted in religious belief.'" *Pacific Press*, 676 F.2d at 1279 (quoting *Wisconsin v. Yoder*, 406

---

those cases and his suggestion is misplaced. Unlike those cases, this case does not involve internal church conflicts over religious doctrine, practice or discipline. Furthermore, this case does not involve any issue impacting on the relationship between a church and its ministers. Plaintiffs make no challenge to: the decision of the Mormon Church to deny them temple recommends, the Mormon Church's right to set the standards used by that church to make those decisions, the Mormon Church's right or authority to determine whether or not the plaintiffs are members in good standing, the right of the Mormon Church to decide whom it will regard as members or who will best propogate its doctrine. Neither do the plaintiffs challenge the validity of any of the religious beliefs held by the Mormon Church. What they do challenge is the right of a religious organization to impose religious qualifications as a condition of employment on its employees performing secular, non-religious jobs. Federal courts have consist-

ently held that *Watson* and progeny do not preclude courts from adjudicating Title VII claims against religious employers where the aggrieved employees do not hold positions of ministers. *Pacific Press*, 676 F.2d 1272 (9th Cir. 1982); *Southwestern Baptist*, 651 F.2d 277 (5th Cir.1981), *cert. denied*, 456 U.S. 905, 102 S.Ct. 1749, 72 L.Ed.2d 161 (1982).

**50.** As the Court in *Mississippi College* acknowledged:

To the extent that the College's practices foster sexual or racial discrimination, the EEOC, if unable to persuade [them to voluntarily alter the practices], could seek a court order compelling their modification, imposing injunctive restraints upon the College's freedom to make employment decisions, and awarding monetary relief to those persons aggrieved by the prohibited acts.

*626 F.2d at 488.*

U.S. 205, 215, 92 S.Ct. 1526, 1533, 32 L.Ed.2d 15 (1972)).

▬ Even if there were some burden on the exercise of a sincerely held belief, the free exercise clause would not be violated because Title VII's purpose to eliminate all forms of employment discrimination "is equally if not more compelling than other interests that have been held to justify legislation that burdened the exercise of religious convictions." *Pacific Press*, 676 F.2d at 1280. As the Supreme Court recently stated in upholding the denial of tax-exempt status to private schools practicing racial discrimination:

> [n]ot all burdens on religion are unconstitutional.... The State may justify a limitation on religious liberty by showing that it is essential to accomplish an overriding governmental interest.

. . . .

On occasion this court has found certain governmental interests so compelling as to allow even regulations prohibiting religiously based conduct. In *Price v. Massachusetts* [321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944) ] ..., for example, the Court found no constitutional infirmity in "excluding [Jehovah's Witness Children] from doing what no other children may do." ... Denial of tax benefits will inevitably have a substantial impact on the operation of private religious schools, but will not prevent those schools from observing their religious tenets.

*Bob Jones University v. United States*, 461 U.S. 574, ——, 103 S.Ct. 2017, 2035, 76 L.Ed.2d 157 (1983).

**51.** An additional observation by the Court in that case also is pertinent in this case: "Granting an exemption from social security taxes to an employer operates to impose the employer's religious faith on the employees." 455 U.S. at 261, 102 S.Ct. at 1057.

**52.** Justice Stevens, in his concurring opinion, stated:

> Today's holding is limited to a claim to a tax exemption. I believe, however, that a standard that places an almost insurmountable burden on any individual who objects to a

Similarly, in *United States v. Lee*, 455 U.S. 252, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982), the Supreme Court held that the free exercise clause did not require an exemption from social security taxes for Amish employers, even though the Amish religion prohibits both the acceptance of social security benefits and the payment of contributions by the Amish to the social security system. In finding that the government had a "very high" interest "in assuring mandatory and continuous participation in and contribution to the social security system," *id.* at 258–59, 102 S.Ct. at 1055–1056, the Court pointed out:

> Congress and the courts have been sensitive to the needs flowing from the Free Exercise Clause, but every person cannot be shielded from all the burdens incident to exercising every aspect of the right to practice religious beliefs. When followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity.[51]

*Id.* at 261,[52] 102 S.Ct. at 1057.

The Ninth Circuit recently affirmed that Congress' compelling interest in eradicating discrimination is sufficient to justify any actual burden that Title VII's application to secular, non-religious activities would impose on the exercise of sincerely held religious beliefs. See *Pacific Press*, 676 F.2d at 1280–81; *Mississippi College*, 626 F.2d at 489. In *Pacific Press*, there was a clear and acknowledged conflict between a religious doctrine and the enforcement of Title VII.[53] Despite that conflict,

valid neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes) better explains most of this court's holding than does the standard articulated by the Court today.

*Id.* at 261, 263 n. 3, 102 S.Ct. at 1057–1058 n. 3 (Stevens, J., concurring in judgment).

**53.** In that case, the plaintiff asserted that the defendant had discriminated against her on the basis of sex and that she had been fired in retaliation for having filed the sex discrimina-

the Ninth Circuit held that the policies embodied in Title VII were sufficiently compelling to justify the burden.

> [T]here is a substantial impact on the exercise of religious beliefs because EEOC's jurisdiction to prosecute the retaliation action taken against Tobler potentially will impose liability on Press for disciplinary action based on religious doctrine. We find, however, that the government's compelling interest in assuring equal employment opportunities justifies this burden. By enacting Title VII, Congress clearly targeted the elimination of all forms of discrimination as a "highest priority."

676 F.2d at 1280.

Finally, an exemption from Title VII for religious discrimination in secular, non-religious activities would seriously undermine Congress' attempt to eliminate discrimination. To permit religious organizations to engage in religious discrimination in all their secular, non-religious activities would "withdraw Title VII's protection from employees at the hundreds of diverse organizations affiliated with [religious entities], including businesses which process food, sell insurance, invest in stocks and bonds, and run schools, hospitals, laboratories, rest homes and sanitariums." *Pacific Press*, 676 F.2d at 1280. *See also Mississippi College*, 626 F.2d at 489. To allow discrimination to go on in all those activities involving all those employees would impede achievement of the important objectives of Title VII.

Hence, when Congress exempted religious organizations from Title VII with regard to religious discrimination in secular, non-religious activities, it was not constitutionally compelled to do so. The court consequently must determine whether Congress' "accommodation" to the free exercise clause results in a direct and immediate advancement of religion in violation of the establishment clause.

tion charge. In defending against the retaliation claim, the defendant justified the plaintiffs' dismissal on the ground that she violated a

■ It is well settled that "any program which in some manner aids an institution with religious affiliation" does not necessarily violate the establishment clause. *Mueller v. Allen*, 463 U.S. 388, ——, 103 S.Ct. 3062, 3065, 77 L.Ed.2d 721 (1983). The aid must further the evils against which the establishment clause was designed to protect—"sponsorship, financial support, and active involvement of the sovereign in religious activity." *Walz v. Tax Commission of the City of New York*, 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970). *See Mueller*, 463 U.S. at ——, 103 S.Ct. at 3068. The aid, however, must do more than remotely or incidentally advance or inhibit religion. *See Walz*, 397 U.S. at 674–76, 90 S.Ct. at 1414–1415. *See also, Everson v. Board of Education*, 330 U.S. 1, 15–18, 67 S.Ct. 504, 511–513, 91 L.Ed. 711 (1947). It must have the "primary effect" of advancing or inhibiting religion. *See Lemon v. Kurtzman*, 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745, *reh'g denied*, 404 U.S. 876, 92 S.Ct. 24, 30 L.Ed.2d 123 (1971).

■ In focusing on the term "primary effect," however, it is not possible or necessary for courts to engage in metaphysical judgments as to whether the "primary effect" of a particular law is to promote legitimate secular objectives or to advance religion. *Committee for Public Education v. Nyquist*, 413 U.S. 756, 783 n. 39, 93 S.Ct. 2955, 2971 n. 39 (1973). Rather, the proper inquiry is whether the law in question has the direct and immediate, or substantial, effect of advancing or inhibiting religion. See *id.* at 783–84 n. 39, 93 S.Ct. at 2971 n. 39; *Mueller*, 463 U.S. at ——, 103 S.Ct. at 3072 (Marshall, J., dissenting).

In *McGowan v. Maryland*, 366 U.S. 420 [81 S.Ct. 1101, 6 L.Ed.2d 393] (1961), Sunday closing laws were upheld, not because their effect was, first, to promote the legitimate interest in a universal day of rest and recreation and only secondarily to assist religious interests;

doctrine of the Seventh-Day Adventist Church that prohibits lawsuits by members against the church. 696 F.2d at 1280.

instead approval flowed from the finding, based on a close examination of the history of such laws, that they had only a remote and incidental effect advantageous to religious institutions.... Likewise, in [*Abington Township v.*] *Schempp* [374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963)] the school authorities argued that Bible-reading and other religious recitations in public schools served, primarily, secular purposes, including "the promotion of moral values, the contradiction to the materialistic trends of our times, the perpetuation of our institutions and the teaching of literature." ... Yet, without discrediting these ends and without determining whether they took precedence over the direct religious benefit, the Court held such exercises incompatible with the Establishment Clause.... Any remaining question about the contours of the "effect" criterion were resolved by the Court's decision in *Tilton* [*v. Richardson*, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971)] in which the plurality found that the mere possibility that a federally financed structure might be used for religious purposes 20 years hence was constitutionally unacceptable because the grant might *"in part* have the effect of advancing religion." ... [S]ecular objectives, no matter how desirable and irrespective of whether judges might possess sufficiently sensitive calipers to ascertain whether the secular effects outweigh the sectarian benefits, cannot serve today any more than they could 200 years ago to justify such a direct and substantial advancement of religion.

*Nyquist,* 413 U.S. at 784–85 n. 39, 93 S.Ct. at 2971 n. 39.

The court in *King's Garden, Inc. v. Federal Communications Commission,* 498 F.2d 51 (D.C.Cir.1974), in dictum, concluded that section 702 is unconstitutional. The focus of the court's analysis was on the exemption's primary or direct and immediate effect.

> [T]he exemption invites religious groups, and them alone, to impress a test of faith on job categories, and indeed whole enterprises, having nothing to do with the exercise of religion.[54]
>
> ....
>
> It was not of course, constitutionally required that Congress prohibit religious discrimination in private sector employment. But this having been done, by the Civil Rights Act, the wholesale exemption for religious organizations alone can only be seen as a special preference.... [55] The First Amendment demands "neutrality" of treatment between religious and non-religious groups....

*Id.* at 55. The District of Columbia Circuit Court's criticism is well founded.

*King's Garden, Inc. v. F.C.C.,* 498 F.2d 51, 54–55 (D.C.Cir.1974).

**54.** In reaching that conclusion, the *King's Garden* court explained as follows:

> In covering all of the "activities" of any "religious corporation, association, educational institution, or society," the exemption immunizes virtually every endeavor undertaken by a religious organization. If a religious sect should own and operate a trucking firm, a chain of motels, a race track, a telephone company, a railroad, a fried chicken franchise, or a professional football team, the enterprise could limit employment to members of the sect without infringing the Civil Rights Act. If owned and operated by a nonreligious organization, the enterprise could not use sectarian criteria in hiring, except where the particular job position carried a "bona fide occupational qualification" of a religious character.

**55.** A legal commentator also has reached that conclusion:

> An example of a statutory benefit that impermissibly relies on religious criteria is the present religious exemption in Title VII, which permits a religious organization to practice employment discrimination on the basis of religion in any of its activities. This exemption runs afoul of the establishment clause, because it singles out religious organizations for preferential treatment and thus confers a benefit or withholds a burden on the basis of a purely religious classification.

Bagni, Discrimination in the Name of the Lord: A Critical Evaluation of Discrimination by Religious Organizations. 79 Colum.L.Rev. 1514, 1547–48 (1979).

The Supreme Court consistently has found it significant that an exemption or benefit was provided to a broad spectrum of groups and was not limited to religious institutions. Most recently, in *Mueller v. Allen*, 463 U.S. 388, 103 S.Ct. 3062, 77 L.Ed.2d 721 (1983), the Supreme Court found it particularly important that the state law in question[56] permitted *"all* parents, including those whose children attend public schools and those whose children attend non-sectarian private schools or sectarian private schools," to deduct educational expenses. *Id.* at ——, 103 S.Ct. at 3068 (emphasis in original).[57]

Just as in *Widmar v. Vincent* [454 U.S. 263, 102 S.Ct. 269, 70 L.Ed.2d 440 (1981)] ... where we concluded that the State's provision of a forum neutrally "open to a broad class of nonreligious as well as religious speakers" does not "confer any imprimatur of State approval," so here: "the provision of benefits to so broad a spectrum of groups is an important index of secular effect."

In this respect, as well as others, this case is vitally different from the scheme struck down in *Nyquist*. There, public assistance amounting to tuition grants, was provided only to parents of children in *nonpublic* schools. This fact had considerable bearing on our decision striking down the New York statute at issue .... [W]e intimated that "public assistance ... made available generally without regard to the sectarian-nonsectarian or public-nonpublic nature of the institution," ... might not offend the Establishment Clause. We think the tax deduction adopted by Minnesota is more similar to this latter type of program than it is to the arrangement struck down in *Nyquist*. Unlike the assistance at issue in *Nyquist*, § 290.09(22) permits *all* parents—whether their children attend public school or private—to deduct their children's educational expenses. As *Widmar* and our other decisions indicate, a program, like § 290.09(22), that neutrally provides state assistance to a broad spectrum of citizens is not readily subject to challenge under the Establishment Clause.

*Id.* at ——, 103 S.Ct. at 3068–3068 (emphasis in original).[58]

Our decisions consistently have recognized that traditionally "[l]egislatures have especially broad latitude in creating classifications and distinctions in tax statutes," ... in part because the "familiarity with local conditions" enjoyed by the legislators especially enables them to "achieve an equitable distribution of the tax burden." ... Under our prior decisions, the Minnesota legislature's judgment that a deduction for educational expenses fairly equalizes the tax burden on its citizens and encourages desirable expenditures for educational purposes is entitled to substantial deference.

*Id.* at ——, 103 S.Ct. at 3067. Defendants here argue that Title VII as a whole contains a number of exemptions and that Congress has carefully drafted the whole statute, making policy decisions about the scope of Title VII and its applications to various types of situations throughout its provisions. Supporting Brief, at 18. Those attempts to narrow the distinctions between section 702 and the laws at issue in *Walz* and *Mueller* are without merit.

The second feature that the Court found significant was that the assistance to parochial schools was channeled through individual parents. "Where, as here, aid to parochial schools is available only as a result of decisions of individual parents no 'imprimatur of State ap-

---

56. In *Mueller,* the Supreme Court was reviewing a Minnesota law that permitted state taxpayers to claim a deduction from gross income for actual expenses incurred for the "tuition, textbooks and transportation" of dependents attending elementary or secondary schools. The deduction was limited to $500 per dependent in grades one through six and $700 per dependent in grades seven through twelve. *Mueller,* at ——, 103 S.Ct. at 3064. The plaintiffs contended that the law violated the establishment clause by providing financial assistance to sectarian schools. *Id.*

57. The Court appears to engage in a two part analysis in that case. It first looked at the characteristics of the tax deduction to determine whether they indicated that the aid to religion was direct or indirect. Having found that the tax deduction was an "attenuated financial benefit flowing to parochial schools," the Court then examined the deduction to see if it furthered any of the evils "against which the Establishment Clause was designed to protect." *Id.* at ——, 103 S.Ct. at 3069.

58. The *Mueller* Court found two other characteristics of the state law important, neither of which is present here. First section 290.09(22) was only one of many deductions. In discussing that feature, the court stated:

In *Nyquist,* 413 U.S. 756, 93 S.Ct. 2955, 37 L.Ed.2d 948 (1973), the Supreme Court struck down a New York law [59] which provided financial assistance, in several ways, to nonpublic elementary and secondary schools in the state as an advancement of religion in violation of the establishment clause. In doing so, the Court distinguished the laws in three cases in which the Supreme Court had approved a form of financial assistance that conferred benefits on private, sectarian schools:[60]

> *Allen and Everson* differ from the present litigation in [an] important respect. In both cases the class of beneficiaries included *all* schoolchildren, those in public as well as those in private schools. See also *Tilton v. Richardson, supra,* in which federal aid was made available to *all* institutions of higher learning....

413 U.S. at 782 n. 38, 93 S.Ct. at 2970 n. 38.[61] The *Nyquist* Court used the same reasoning to distinguish another one of its cases in which it rejected a challenge to a law on establishment grounds:

> The exemption challenged in *Walz* was not restricted to a class composed exclusively or even predominantly of religious institutions. Instead, the exemption covered all property devoted to religious, educational, or charitable purposes. As the parties here must concede, tax reductions authorized by this law flow primarily to the parents of children attending sectarian, nonpublic schools. Without intimating whether this factor alone might have controlling significance in another context in some future case, it should be apparent that in terms of the potential divisiveness of any legislative measure the narrowness of the benefitted class would be an important factor.

*Id.* at 794, 93 S.Ct. at 2976.

The Supreme Court also acknowledged the importance of the scope of an exemption in *Walz v. Tax Commission of the City of New York,* 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (1970).

> [The New York legislature] has not singled out one particular church or religious group or even churches as such; rather, it has granted exemption to all houses of religious worship within a broad class of property owned by nonprofit, quasipublic corporations which include hospitals, libraries, playgrounds, scientific, professional, historical, and patriotic groups. The State has an affirmative policy that considers these groups as beneficial and stabilizing influences in community life and finds this classifica-

---

proval,' ... can be deemed to have been conferred on any particular religion, or on religion generally." *Mueller,* at ——, 103 S.Ct. at 3069. Here, the benefit is conferred directly on religious organizations.

**59.** The law in question established three distinct financial aid programs for nonpublic elementary and secondary schools. The first program provided "for direct money grants from the state to 'qualifying' nonpublic schools to be used for the 'maintenance and repair of ... school facilities and equipment to ensure the health, welfare and safety of enrolled pupils.'" *Nyquist,* 413 U.S. at 762, 93 S.Ct. at 2960 (citation omitted). The second program provided for a tuition reimbursement plan for parents of children attending nonpublic elementary or secondary schools. The third program provided tax relief to those who did not qualify for tuition reimbursement.

**60.** Those cases were *Tilton v. Richardson,* 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971); *Board of Education v. Allen,* 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968) and *Everson*

*v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947). In *Everson,* the Court approved a program that provided reimbursements to parents of public as well as parochial school children for bus fares paid in connection with transportation to and from school. In *Allen,* the Court upheld a law authorizing the provision of secular textbooks for all children in grades seven through twelve attending public and nonpublic schools. In *Tilton,* the Court approved federal grants of funds for the construction of facilities to be used for clearly secular purposes by public and nonpublic institutions of higher learning.

**61.** Another factor that was important to the *Nyquist* Court was that there were no appropriate restrictions on the benefits to ensure that the state aid would be used exclusively for secular, neutral and nonideological purposes. See *Nyquist,* 413 U.S. at 774–85, 93 S.Ct. at 2966–2972. This court has the same complaints about section 702.

tion useful, desirable, and in the public interest. . . .

*Id.* at 672–73, 90 S.Ct. at 1413.[62]

In addition to not being facially neutral, section 702 also lacks other characteristics that the Supreme Court has looked to in declaring statutes valid as against claims of establishment clause violations. In *Walz*, the Supreme Court stressed the peculiar historical role of property tax exemptions for places of worship,[63] *Walz*, 397 U.S. at 676–78, 90 S.Ct. at 1415–1416, and observed that "[n]othing in this national attitude toward religious tolerance and two centuries of uninterrupted freedom from taxation has given the remotest sign of leading to an established church or religion and on the contrary it has operated affirmatively to help guarantee the free exercise of religious belief." *Id.* at 678, 90 S.Ct. at 1416. In contrast, no historical tradition supports the 1972 exemption [64] and there are no similar hostility-based reasons underlying the history of the exemption contained in section 702. Furthermore, the abolition of the governmental exclusion for religious organizations' religious discrimination in secular, non-religious activities does not present any conflict with the free exercise clause. Consequently, the principal of accommodation espoused in *Walz* has little relevance here.

In fact, in this case, rather than conflicting, the two clauses compliment each other and dictate the same result. Abolition of the exclusion for non-religious, secular activities enhances rather than violates the free exercise clause; it keeps religious institutions from being permitted to burden the free exercise rights of nonmembers who seek employment in non-religious jobs. *See Sherbert v. Verner*, 374 U.S. 398, 409, 83 S.Ct. 1790, 1796, 10 L.Ed.2d 965 (1963).[65] Furthermore, allowing the exemption to be applied in secular, non-religious activities creates the type of coercion and restricted alternatives that the Supreme Court found absent from the Sunday closing laws that it validated in *McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961).

In *McCollum*, state action permitted religious instruction in public school buildings during school hours and required students not attending the religious instructions to remain in their classrooms during that time. The Court found that this system had the effect of coercing the children to attend religious classes; no such coercion to attend church services is present in the situation at bar. In *McCollum*, the only alternative available to the nonattending students was to remain in their classrooms; the alterna-

---

**62.** The *Walz* Court noted that the "[e]limination of the exemption would tend to expand the involvement of government by giving rise to tax valuation of church property, tax liens, tax foreclosures, and the direct confrontations and conflicts that follow in the train of those legal processes," 397 U.S. at 674, 90 S.Ct. at 1414. Although elimination of the exemption for religious organizations with regard to religious discrimination in its secular, nonreligious activities would increase government involvement, that involvement is not excessive. Furthermore, the court cannot believe that the *Walz* Court intended the factor of increased involvement to be the determinative issue.

**63.** The reason underlying the long history of tolerance of tax exemptions for houses of worship was the recognition that taxation could be one form of hostility toward religion and that actual exemption from taxation constituted "a reasonable and balanced attempt to guard

against those dangers." *Walz*, 397 U.S. at 673, 90 S.Ct. at 1413.

**64.** Although the Court acknowledged that long use does not result in a vested or protected right in violation of the Constitution, it also stated that "an unbroken practice of according the exemption to churches, openly and by affirmative state action, not covertly or by state inaction, is not something to be lightly cast aside." *Id.* at 678, 90 S.Ct. at 1416.

**65.** In rejecting a claim that the Court would be fostering the establishment of the Seventh-Day Adventist religion by extending unemployment benefits to Sabbatarians, the Court in *Sherbert* made the following observation: "[T]he recognition of the appellant's right to unemployment benefits under the state statute does not serve to abridge any other person's religious liberties." 374 U.S. at 409, 83 S.Ct. at 1797. The same is not true in this case.

tives open to nonlaboring persons in the instant case are far more diverse.

*Id.* at 452, 81 S.Ct. at 1119.

Finally, there is no need in this case to protect religious organizations from the burdens of secularism. *See Wisconsin v. Yoder*, 406 U.S. 205, 234–35 n. 22, 92 S.Ct. 1526, 1542–1543 n. 22, (1972); *Sherbert v. Verner*, 374 U.S. 398, 409, 83 S.Ct. 1790, 1796, 10 L.Ed.2d 965 (1963).[66] As the court in *King's Garden* observed:

> It is conceivable that there are "many areas in which the pervasive activities of the State justify some special provision for religion to prevent it from being submerged by an all-embracing secularism."
> ... But it hardly follows that the state may favor religious groups when they themselves *choose* to be submerged, for profit or power, in the "all-embracing secularism" of the corporate economy.

*King's Garden*, 498 F.2d at 57 (emphasis in original). Thus, section 702 is devoid of any of the important characteristics on which the Supreme Court has relied in upholding statutes against establishment clause claims.

Having determined that section 702 does not possess any of the characteristics that the Supreme Court has looked to in upholding statutes against establishment clause claims, the court now turns to the question whether section 702 furthers any of the evils against which the establishment clause was designed to protect—"sponsorship, financial support, and active involvement of the sovereign in religious activity." *Walz*, 397 U.S. at 668, 90 S.Ct. at 1411.

Even though exemptions are generally one of the least direct forms of aid to

religion, *Kosydar v. Wolman*, 353 F.Supp. 744, 763 (S.D.Ohio 1972), *aff'd sub. nom.*, *Grit v. Wolman*, 413 U.S. 901, 93 S.Ct. 3062, 37 L.Ed.2d 102, (1973), the Supreme Court has stated that "[t]he Court must not ignore the danger that an exception from a general obligation of citizenship on religious grounds may run afoul of the Establishment Clause." *Wisconsin v. Yoder*, 406 U.S. 205, 220–21, 92 S.Ct. 1526, 1536, 32 L.Ed.2d 15 (1972). In the opinion of this court the exemption provided in section 702 for secular, non-religious activities has done just that by directly and immediately furthering the sponsorship of religion by government.

While the establishment clause's condemnation of "sponsorship" usually is aimed at financial sponsorship,

> in drafting the Clause the Founders were taking equally keen aim at all non-financial 'sponsorship' of religious organizations by government.... And sponsorship is what this exemption accomplishes. It is a sure formula for concentrating and vastly extending the worldly influences of those religious sects having the wealth and inclination to buy up pieces of the secular economy.[67]

*King's Garden*, 498 F.2d at 55.[68] Hence, the exemption contained in section 702, as applied to secular, non-religious activities, violates the establishment clause by granting religious organizations an exclusive authorization to engage in conduct which can directly and immediately advance religious tenets and practices. Section 702 therefore is invalid as applied to secular non-religious activities, and defendants' motion to dismiss, or, alternatively for summary judg-

---

**66.** In *Yoder,* the Court rejected an establishment claim and in doing so, stated:

> Accommodating the religious beliefs of the Amish can hardly be characterized as sponsorship or active involvement. The purpose and effect of such an exemption are not to support, favor, advance, or assist the Amish, but to allow their centuries-old religious society ... to survive free from the heavy impediment compliance with the Wisconsin compulsory-education law would impose....

*Yoder,* 406 U.S. at 234–35 n. 22, 92 S.Ct. at 1543 n. 22.

**67.** The court in *King's Garden* noted that, in many American religious groups, the wealth and inclination apparently exists. 498 F.2d at 55 n. 9.

**68.** The court cannot find any benefits, such as the court in *Mueller* found, to offset "whatever unequal effect may be attributed to the statutory classification" in section 702. *Mueller,* 463 U.S. at ——, 103 S.Ct. at 3070.

ment, must be denied as it relates to the First and Second Causes of Action of the complaint.

### 3. *Excessive Entanglement*

Given the court's determination under the second prong of the *Lemon* test, application of the third prong of that test is not necessary to this decision. Nevertheless, and inasmuch as the court believes that application of the third prong will further demonstrate the problems that the broad exemption in section 702 creates, the court will undertake such an analysis.

Courts continually talk about maintaining the wall between church and state. However, "total separation is not possible in an absolute sense"; it is inevitable that there will be "[s]ome relationship between government and religious organizations." *Lemon*, 403 U.S. at 614, 91 S.Ct. at 2112. The line of separation that must exist between the two "is a blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship." *Id.* To determine whether a particular law crosses that line and excessively entangles the government with religious organizations, the court "must examine the character and purpose of the institutions that are benefitted, the nature of the aid that the state provides, and the resulting relationship between the government and the religious authority." *Lemon*, 403 U.S. at 615, 91 S.Ct. at 2112.

The institutions that are benefitted by the exemption provided in section 702 are, by definition, all religious corporations, associations, educational institutions and societies. Even though the exemption is directed only at religious organizations, the purpose and character of the institutions benefitted and affected by the exemption extends beyond those entities to any other institution through which the religious organizations perform their "activities." Thus, the character and purpose of both the religious organizations and their activities must be assessed.

The primary purpose of religious organizations, obviously, is to carry on religious rituals, teach religious doctrine and proselytize. They, however, may engage in both religious and secular activities, and the institutions they acquire to carry on their activities may be religious and/or secular in nature and purpose. In this particular case, the Mormon Church's primary purpose is the same as any other religious organizations—religious. The defendants are corporation soles of the Mormon Church which were formed to facilitate Mormon Church activities. They therefore are an integral part of the Mormon Church. The defendants, however, engage in both religious and secular activities and have acquired various institutions to carry out those activities. They can exercise complete control over all aspects of any institutions they acquire. With respect to the institution at issue here, Deseret, the record shows that they exercise a significant amount of control over Deseret's affairs.

The purpose of Deseret is to provide facilities for physical exercise in an atmosphere reflecting the standards of the Mormon Church. Its purpose, as discussed earlier, is secular. Deseret is not an integral part of the religious mission of the Mormon Church, although it is a desirable accommodation to certain values that the Mormon Church professes to be good. However, the vast control the Mormon Church exercises over Deseret through the defendants creates a situation where the religious beliefs of the Mormon Church can be furthered through Deseret, as well as any other institution it acquires and controls. This potential for furthering religious beliefs and adherence to Mormon Church doctrine is enhanced by the fact that peoples' opportunity to earn a living is at stake. Thus, this first factor weighs against the defendants.

As to the second consideration, the nature of the aid provided by section 702 is an exemption from the application of Title VII that permits all religious entities to discriminate on the basis of religion in their employment practices and policies. That exemption poses a danger to the separation between church and state. Section 702 in-

volves institutions whose legitimate needs are growing and whose interests have substantial political support. Religious organizations can and do engage in a variety of activities today, ranging from totally religious to purely commercial. Those activities, whether religious or secular, exist in a system dedicated to furthering religious belief and ritual. Religious authority necessarily pervades all the activities in which a religious organization engages.

A religious organization can and, as this case demonstrates, does exercise control over every person it employs. Through the control it maintains over its activities, financially and in day-to-day operations, the religious organization can subject all the employees to the direction and discipline of religious authorities. Those religious authorities can ensure that every employee in every one of its activities is a practicing member of its religious faith. Further, it can refuse to hire and even fire anyone who cannot and will not remain a member in good standing in its church. Under section 702, the government has given religious organizations the authorization to exercise that type of coercive power.

Although a religious organization may never abuse section 702 to foster religion,[69] there is a potential if not an actual hazard created by this type of aid. Inevitably some of the activities in which religious organizations engage will hover on the border between secular and religious, and some activities will be purely secular.

The court does not assume that religious organizations will be guilty of bad faith or any conscious design to impose their beliefs on the population through employment. It simply recognizes that dedicated religious authorities, who are responsible for running religious organizations affiliated with their faith and created and operated to benefit their religion, will inevitably experience great difficulty in not advancing their religion through employment practices. With the best of intentions, religious authorities in charge of the activities of the religious organization would find it difficult to totally separate their religious beliefs from their ideas regarding valid business practices. What would appear to some to be essential to carrying on an activity might well for others border on or constitute coercive religious discrimination practices.

It may well be that religious authorities running religious organizations will be successful in their attempts to segregate their religious beliefs from their responsibilities regarding what types of conditions and qualifications they should impose on employees performing various activities. No assumption is made otherwise. However, the fact remains that the potential for impermissible fostering of religion is present. Congress cannot provide a federal exemption for religious organizations based on an assumption that religious authorities running religious organizations will avoid using section 702 to further religious beliefs. *See Lemon* 403 U.S. at 619, 91 S.Ct. at 2114. *See also Nyquist,* 413 U.S. at 778–79, 93 S.Ct. at 2968–2969. Congress must be certain, given the religion clauses, that by enacting an exemption it does not grant power to religious authorities to establish a religion. *See Lemon,* 403 U.S. at 619, 91 S.Ct. at 2114. Congress has not sought to ensure that no trespass occurs by restricting the exemption. Thus, this second factor also tends toward a finding of excessive entanglement.

The final inquiry is the relationship that section 702 creates between the government and religious authorities and here the court is of the opinion that the relationship between the two is not excessive. Section 702 does not require the type of compre-

---

**69.** If a religious organization has the finances and desires to coerce adherence to its religious beliefs and support for its faith, it could purchase commercial enterprises and impose religious qualifications on all its employees. Employees living in communities in which religious organizations engaged in such conduct would be forced to conform to the religious requirements if they wanted a job. This is purely hypothetical however, and there is no evidence in this case that the defendants are using or ever would use section 702 to further its religion.

hensive, discriminatory and continuing state or federal surveillance that was condemned in cases such as *Lemon.* It does not require an inspection or evaluation of religious organizations or surveillance of employees, as the law in *Lemon* required and empowered the state to do. On the converse, this exemption was designed to minimize involvement and entanglement between church and state [70] and to ensure that the government and courts do not go through the rigors of inspecting and analyzing whether the activities in which a religious entity is engaging are religious or secular, thus avoiding an intimate and continuing relationship between church and state. See *Walz,* 397 U.S. at 674, 698–99, 90 S.Ct. at 1414, 1426–1427. In addition, the type of aid afforded by section 702 does not involve entanglement in "the broader sense of continuing political strife over aid to religion." *Nyquist,* 413 U.S. at 794, 93 S.Ct. at 2976. *Cf. Lemon,* 403 U.S. at 622–23, 91 S.Ct. at 2115–2116 ("The potential for political divisiveness related to religious belief and practice is aggravated in these two statutory programs by the need for continuing annual appropriations and the likelihood of larger and larger demands as costs and population grow."). Section 702 creates a status under federal antidiscrimination law for the benefit of all religious groups. That "kind and degree of government involvement in religious life" is not "apt to lead to strife and frequently strain a political system to the breaking point." *Walz,* 397 U.S. at 694, 90 S.Ct. at 1424.[71] Consequently, this third factor favors a finding of no entanglement.

If the court had to balance those three factors, it is not clear which way the balance would tip. The court, however, will not attempt such a process in light of its finding that the direct and immediate effect of the exemption of religious organizations from Title VII for religious discrimination

in secular, non-religious activities is to advance religion in violation of the establishment clause of the first amendment to the United States Constitution.

C. Due Process and Equal Protection Claims

The defendants have moved to dismiss the plaintiffs' claims that are predicated on the due process and equal protection clauses of the United States Constitution. After carefully reading the defendants' arguments directed to those claims, see Supporting Memorandum, at 57–59, and after finding that the plaintiffs have not responded to the arguments, the court has concluded that it would be inappropriate to rule on those claims at this time. Therefore, ruling is reserved on the defendants' motion thereon until the parties have had an opportunity to further present their positions to the court.

III.

*State Claims for Relief*

In their third claim for relief, plaintiffs allege that the defendants terminated plaintiffs wrongfully and without cause by terminating their employment because of their inability or unwillingness to meet the worthiness requirements of the Mormon Church for a temple recommend. Complaint, at 14. The plaintiffs seek compensatory and exemplary damages for such allegedly wrongful termination. *Id.* at 16–17. In their fourth claim for relief, plaintiffs allege that the defendants intentionally and wrongfully inflicted extreme mental and emotional injury and distress on plaintiffs by subjecting the plaintiffs to the Mormon Church requirement and thereafter threatening to fire and firing plaintiffs due to their inability or unwillingness to satisfy the worthiness requirement. *Id.* at 15. The plaintiffs seek compensatory and ex-

---

**70.** The court notes that the entanglement that would result if federal agencies and the courts were required to decide what activities are religious and what activities are not is not the type of entanglement prohibited by the first amendment. See *supra* pp. 812–816.

**71.** In *Lemon,* the laws in question created the need for successive and permanent annual appropriations that only benefitted a few religious groups.

emplary damages for that alleged tortious conduct. *Id.* at 17. . If plaintiffs have a cause of action against the defendants under either or both of those claims for relief, it clearly arises under state law.

 It is well established that a federal district court has broad discretion as to whether or not to accept jurisdiction over a pendent claim when a plaintiff has plead a valid federal cause of action. See *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The plaintiffs have stated a federal cause of action, and the court deems it appropriate to assume jurisdiction over the pendent claims.

### A. Wrongful Discharge Claim Under Utah Law

 To determine whether the plaintiffs have stated a valid cause of action for wrongful discharge, the court must look to Utah law. The law in Utah is that a contract employing a person without any agreement as to period of service is to be deemed a hiring at will subject to termination at the will of either party. In its most recent pronouncement, the Utah Supreme Court continued to adhere to the termination-at-will doctrine and implied that it would not recognize a claim for wrongful discharge.

The general rule concerning personal employment contracts is, in the absence of some further express or implied stipulation as to the duration of the employment or of a good consideration in addition to the services contracted to be rendered, the contract is no more than an indefinite

general hiring which is terminable at the will of either party.... When an ... individual is hired for an indefinite time, he has no right of action against his employer for breach of the employment contract upon being discharged.

*Bihlmaier v. Carson*, 603 P.2d 790, 792 (Utah 1979). Plaintiffs do not assert that they were anything more than employees at will. Rather, they ask this court to follow the trend of other courts that have created exceptions to the terminable-at-will doctrine.[72] In particular, the plaintiffs contend that they must be allowed redress in the form of a wrongful discharge cause of action because the firing of plaintiffs for religious reasons violates the compelling national policy against religious discrimination.

 Although this court has the duty and power to mold the laws of this state when applying uncertain state law, *McKinney v. National Dairy Council*, 491 F.Supp. 1108, 1118–22 (D.Mass.1980),[73] it may not change existing state law. The plaintiffs argue that none of the Utah cases that defendants cite is dispositive because in none of the cases was the Utah Supreme Court asked to · recognize a wrongful discharge cause of action. However, the long history of the Utah Supreme Court's recognition of the terminable-at-will doctrine, the language the court has used in dismissing those cases and the failure of the court to ever suggest that it might recognize an exception to that rule lead this court to the conclusion that the recognition of an exception to the terminable-at-will doctrine would be a change in Utah law. *See Bihlmaier v. Carson*, 603

---

**72.** Courts recently have judicially created an exception to the terminable-at-will doctrine where the reason an employee was fired violates an important public policy. *See e.g., Brown v. Transcon*, 284 Or. 597, 588 P.2d 1087 · (1978) (discharge for filing claim for workmen's compensation); *Nees v. Hocks*, 272 Or. 210, 536 P.2d 512 (1975) (discharge for performing jury duty); *Petermann v. International Brotherhood of Teamsters*, 174 Cal.App.2d 184, 344 P.2d 25 (1959) (termination for refusal to commit perjury). *But cf.,* Annot., 9 A.L.R. 4th 329, at § 3[b] (1981 & Supp.1983). See generally, Annot. 12 A.L.R. 4th 544 (1982 & Supp. 1983).

**73.** The court believes that *McKinney* is distinguishable because in that case, the Superior Judicial Court of Massachusetts had recognized in one case that the contract contained an implied covent of good faith and fair dealings and the federal court applied that finding to the case before it. Here, the Utah Supreme Court has never recognized an exception to the terminable-at-will doctrine in any of its cases and has not indicated that it would recognize an exception under certain circumstances.

P.2d 790, 792 (Utah 1979) ("When an individual is hired for an indefinite time, he has no right of action against his employer for breach of the employment contract upon being discharged."); *Crane Co. v. Dahle*, 576 P.2d 870, 872 (Utah 1978) ("In the absence of a contract for a definite term, an employer may quit whenever he desires, the same as the employer may fire him."); *Held v. American Linen Supply Co.*, 6 Utah 2d 106, 307 P.2d 210, 211 (1957) ("Whether [an employee] has a cause of action if she were discharged without just cause depends upon the terms of the contract, either express or implied. . . ."). The Utah Supreme Court may decide to recognize an exception in the future, but this court is not at liberty to determine what Utah law ought to be. Thus, the plaintiffs' third claim for relief based on wrongful discharge must be dismissed.

B. Intentional Infliction of Emotional Injury Claim

■■■ The Utah Supreme Court has recognized the existence of a cause of action for the intentional infliction of emotional distress. To state a cause of action for such a tort, the following standard must be met:

Our study of the authorities, and of the arguments advanced, convinces us that, conceding such a cause of action may not be based upon mere negligence, the best considered view recognizes an action for severe emotional distress, though not accompanied by bodily impact or physical injury, where the defendant intentionally engaged in some conduct toward the plaintiff, (a) with the purpose of inflicting emotional distress, or (b) where any reasonable person would have known that such would result; and his actions are of such a nature as to be considered outrageous and intolerable in that they offend against the generally accepted standards of decency and morality.

*Samms v. Eccles*, 11 Utah 2d 289, 358 P.2d 344, 346–47 (1961). The Utah Supreme Court has continued to follow that rule.

*Covert v. Kennecott Copper Corp.*, 23 Utah 2d 252, 461 P.2d 466, 468 (1969).

■■■ The plaintiffs claim that the following acts constitute a basis upon which recovery for intentional infliction of emotional distress can be sustained:

50. In connection with the CORPORATIONS' demand that they satisfy the Mormon worthiness requirement, plaintiffs were obligated to respond to certain inquiries formally put to them by authorities of the Mormon Church. These inquiries were intensely personal and intimate in nature, and they necessitated answering questions concerning, among others, the following:

(a) plaintiffs' sexual activities;

(b) plaintiffs' moral cleanliness and purity;

(c) plaintiffs' income and his or her past and future contributions to the Mormon Church; and

(d) plaintiffs' past and future obedience and allegiance to, and support of Mormon leaders.

51. Upon information and belief, the CORPORATIONS' purpose in imposing upon plaintiffs the Mormon worthiness requirement included the following:

(a) to impose Mormon beliefs and practices upon plaintiffs by means of economic coercion, i.e., by means of extending or withholding employment, the nature of which employment is secular and without religious significance;

(b) to exact from plaintiffs a portion of their wages as tithes in return for extending to plaintiffs the opportunity for continued employment; and

(c) to exact religious obedience from plaintiffs, and to impair their freedom of thought and expression.

Complaint, C–83–0492W, at 14–15 (Apr. 4, 1983). Whether or not the plaintiffs' allegations are sufficient to meet the first requirement of Utah's standard, the court is of the opinion that, taking the allegations as true, the plaintiffs cannot meet the second requirement.

The Utah court has not extensively discussed what it means by the term "outra-

geous and intolerable" actions. It, however, has cited approvingly to section 46 of the Restatement of Torts. See *Samms*, 358 P.2d at 347 n. 14.[74] Comment d to section 46 of the Restatement (Second) of Torts states, in relevant part:

> Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'

Restatement (Second) of Torts, § 46, comment d. Regardless of how the court feels about the appropriateness of the defendants' conduct and, even though the plaintiffs may have been embarrassed, distressed and humiliated, the court concludes, as a matter of law, that the defendants' conduct does not rise to the level of "outrageous and intolerable conduct" contemplated by the Utah Supreme Court. Thus, the plaintiffs' fourth cause of action must be dismissed.

Accordingly,

IT IS HEREBY ORDERED as follows:

1. The defendants' motion to dismiss or, in the alternative, for summary judgment is denied as it relates to the state and federal discrimination claims contained in First and Second Claims for Relief.

2. The defendants' motion to dismiss or, in the alternative, for summary judgment is reserved with regard to the due process and equal protection claims contained in the First and Second Claims for Relief pending further action by the parties.

3. The defendants' motion to dismiss or, in the alternative, for summary judgment is granted with regard to the wrongful discharge claim asserted in the Third Claim for Relief.

4. The defendants' motion to dismiss or, in the alternative, for summary judgment is granted with regard to the emotional injury claim alleged in the Fourth Claim for Relief.

---

**74.** Even though that cite is to section 46 of the Restatement of Torts, the court sees no reason why the Utah court would disapprove of Section 46 of the Restatement (Second) of Torts.